THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BOBBIE DRISKEL, Defendant-Appellant.

First District (3rd Division)    No. 1—88—2817

Opinion filed December 27, 1991.

Randolph N. Stone, Public Defender, of Chicago (Mark Stein, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant, Bobbie Driskel, was convicted of four counts of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 8—4), aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4), armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3). He was sentenced to natural life imprisonment for the four counts of murder, to an extended term of 60 years' imprisonment for the attempted murder, 30 years' imprisonment on each of the five counts of armed robbery, and 15 years' imprisonment for the residential burglary. On appeal, defendant asserts that (1) the compulsion defense should apply to felony murder charges; (2) the 50 graphic photographs depicting the victims' injuries served no evidentiary purpose and were offered only to inflame the passions of the jury; and (3) Illinois law does not mandate natural life in prison for a person convicted of

multiple homicides on the accountability theory because that is a mitigating factor not considered by the statute.

Codefendants Bobbie Driskel and Lawrence Jackson were charged with four murders and numerous other crimes in a 60-count indictment. Driskel asked for and received a separate trial. At their separate trials, both men were convicted, but Jackson was sentenced to death while Driskel was given natural life imprisonment.

On the night of September 24, 1986, Driskel and Jackson went to the Henry Horner Homes at 1850 W. Washington Street, Apt. 210, which was the home of Vernita Winder, to get money for drugs. Also living at that address were six-year-old Urica Winder, four-year-old Dana Winder, one-year-old Shanita Winder, Mark Brown, who was Shanita's father, and Shirley Martin, who was Vernita's friend. Mark Brown, known as Tiny, was Driskel's first cousin.

Detective Patrick Foley testified that he interviewed Driskel at the police station at 2 p.m. on September 25, 1986. At that time, Driskel denied any knowledge of the incident. Later that afternoon, Driskel stated that O.C. Roland drove him and Jackson to the Chicago Housing Authority (CHA) Henry Horner Homes. Earlier that evening, Driskel had smoked cocaine with Jackson, who decided that they would have to steal something to get more cocaine. Driskel suggested that they go to 1850 W. Washington Street because he knew the people who lived there.

Driskel stated that Jackson knocked on the door while Driskel stayed by the stairwell. Tiny let Jackson into the apartment. A short time later, Jackson called Driskel to the door. When Driskel looked into the apartment, he saw Tiny sitting on the couch with blood on him, Vernita lying on the floor with blood on her, and one of the little girls lying on the floor with blood on her. At that point, Jackson picked up the television and VCR, and both men went down to Roland's car. After driving off, Jackson leaned over and whispered to Driskel, "Man, I had to do it."

At 4:30 p.m. on September 25, 1986, Detective Foley again spoke with Driskel, who stated that he went into the apartment after Jackson. Standing in the hallway near the door, Driskel saw Jackson stab Tiny and Vernita in the front room, Shirley by the bedroom, and the children in the bedroom.

Driskel later gave another oral statement during which he stated that he grabbed Shirley when she came out of the bedroom. He held her arms and head while Jackson stabbed her. Jackson then

went into the bedroom, where he stabbed the two girls. Jackson picked up the television, Driskel took the VCR, and they carried the proceeds downstairs.

At 10:30 p.m. on September 25, 1986, Driskel told Detective Foley that he knocked on the apartment door. When Vernita asked who it was, Driskel identified himself. Vernita opened the door, let the two men inside, and went toward the bedroom. After seeing Tiny sitting on the couch, Driskel went into the kitchen, got a knife, walked back to the couch, and stabbed Tiny once before the knife broke. Driskel put the broken handle in his pocket. Jackson then stabbed Tiny.

When Vernita came out of the bedroom, Driskel pushed her back into the bedroom and grabbed her, but was unable to hold her. Vernita ran out of the bedroom and into the kitchen, where Driskel chased her. Driskel got a knife from the kitchen and began stabbing Vernita, but that knife also broke. He then picked up scissors and began stabbing her with the scissors. Jackson also stabbed Vernita.

At that point, Driskel and Jackson went back to the bedroom, where Driskel grabbed Shirley. After she got away, Jackson grabbed her and stabbed her. Jackson then stabbed one of the little girls on the bed. As the other little girl ran toward the front door, Jackson grabbed her and stabbed her. As the two men were taking the television and VCR, the first little girl ran out of the bedroom. Jackson pushed her down and Driskel stabbed her with the scissors, which were broken in half. Driskel and Jackson then took the television and VCR and went downstairs.

Assistant State's Attorney O'Donnell interviewed Driskel on September 25, 1986, at 9 p.m. At 10:15 p.m., Driskel gave a court-reported statement. The next morning, O'Donnell went over the 21-page statement with Driskel, who made and initialed several corrections, then signed the statement. O'Donnell testified that there was a discrepancy in Driskel's oral and written statements. In his oral statement to O'Donnell, Driskel stated that he and Jackson were going to burglarize the apartment. If there were people at home, they planned to rob them. During the court-reported statement, however, Driskel stated that they were supposed to leave if anyone was at home.

O'Donnell read the statement to the jury. In that statement, Driskel related that at 11 p.m. on September 24, 1986, Roland drove him and Jackson to 1850 W. Washington Street in the Henry Horner Homes, where Driskel and Jackson planned to burglarize

the apartment. If people were at home, they were supposed to leave. Roland knew nothing about the plan.

When Driskel and Jackson went to Tiny's apartment, Driskel knocked on the door. Vernita answered the door and let the two men inside. Driskel asked to speak to Tiny, who was asleep. Then, Driskel asked to use the bathroom. After coming out of the bathroom, Driskel went to the front room, where Tiny was lying on the couch. At that time, Jackson had an 18-inch butcher knife in his pants, but Driskel had no weapon. Driskel went into the kitchen, got a knife out of a drawer, and tried to stab Tiny, but the knife broke. Jackson then tried to stab Tiny, but Tiny began kicking him.

At that point, Vernita came out of the bedroom. Driskel pushed her back into the bedroom and told her to be quiet. When Jackson came into the bedroom, Vernita ran out and Driskel chased her. As she tried going out a window, Driskel grabbed her and tried to stab her, but that knife also broke, so he stabbed her with scissors more than once. Jackson then came in and stabbed Vernita.

Driskel then went to Shirley and held her in a headlock. She got away, but Jackson grabbed her and stabbed her. Later, Jackson stabbed one of the little girls on the bed and the other little girl ran and hid in the closet. Jackson followed her. When she ran out of the closet, Jackson stabbed her. As the first little girl ran out of the bedroom, Jackson pushed her down and Driskel stabbed her with scissors. Before leaving, Driskel and Jackson took the television and VCR.

After leaving the apartment, Driskel went to Phil Sims' house, where he sold the television and VCR for $70 in cash and a $15 check. Driskel then went to Chicago Avenue, where he threw the scissors and knife handles into a sewer.

Urica Winder, who was eight years old at trial, was found competent to testify. She told the jurors that Driskel and Jackson came to her home on the evening of September 24, 1986. She knew Driskel, who was Tiny's cousin, and had seen Jackson before. She let the two men in after Driskel identified himself. Her mother then sent her to her bedroom with her sister, Dana. Later, her mother brought her and Dana to the mother's bedroom, where Urica saw Jackson, Driskel, and Shirley. Jackson, who had a 12-inch butcher knife in his hand, was standing in front of Shirley near the wall. When Shirley told Jackson that she loved him, Jackson responded that he did not love her and stabbed her in the heart.

Urica testified that Driskel then walked to the window, where he told Urica that he would not mess with her. Driskel, who had a

knife and pen in his hand, then stabbed her in the stomach with the knife. After he stabbed her, Driskel dug at her guts with the pen that was in his other hand. After Urica was stabbed, both men left the room. As she tried to leave the apartment, Urica was stopped and stabbed again by Driskel. At that point, Urica played dead until both men left.

While lying still, Urica heard Driskel go to the dresser and say, "Damn, ain't no money." Later, Urica discovered that the other people had all been stabbed. When Urica was found the next morning, she told her cousin that "Tiny's cousin Bobby did it." Urica was then taken to the hospital for extensive treatment. While in the hospital, Urica identified Driskel's photograph and picked Jackson's photograph from a photo array.

When Driskel testified at trial, he denied stabbing Tiny, Vernita, Shirley, or Dana. He stated that Jackson suggested going to Tiny's apartment to commit a burglary. If anyone was at home, they were supposed to leave. Driskel denied telling Assistant State's Attorney O'Donnell that they were going to rob anyone who was at home. When Driskel and Jackson arrived at the apartment, Driskel knocked on the door and was surprised to find anyone at home.

Driskel testified that Vernita asked who it was and Driskel identified himself. When Vernita opened the door, Driskel asked to speak to Tiny, but Vernita told him that Tiny was asleep. Driskel then asked to use the bathroom. Both men entered the apartment and Driskel went to the bathroom, where he stayed for 10 to 13 minutes. While he was in the bathroom, he heard children crying and glass breaking.

Driskel left the bathroom, intending to leave the apartment, but saw Shirley lying in the bedroom doorway. There was blood on her and she looked dead. Driskel testified that he panicked and went to the front of the apartment, where he saw Tiny slouched over the couch, bleeding. Dana was standing between the couch and a window.

At that point, Driskel saw Jackson in the kitchen, bent over Vernita, stabbing her with a butcher knife. Driskel stated that he was scared at that time. Jackson got up and walked toward Driskel. Because Jackson still had the bloody knife in his hand, Driskel thought Jackson was going to kill him.

As Dana tried running away, Jackson grabbed her, pushed her to the floor, and stabbed her. Driskel stated that he wanted to help Dana, but could not because Jackson had stabbed him before. Driskel then explained that Jackson stabbed him in 1985 when he

tried stopping Jackson from beating up his wife, who was Jackson's sister. Driskel received treatment for that wound at St. Anne's Hospital.

When he saw Shanita standing near the couch, Driskel further testified, he picked her up and took her to the bedroom. While Jackson was stabbing Dana, Urica ran toward the front door. While pointing the knife, Jackson yelled at Driskel to get her and that no one could leave there alive. Driskel testified that he thought that also meant him. Driskel stated that Jackson said that there would be no witnesses, that either Driskel was part of it or not. Driskel said that he was scared and panicky.

When Driskel grabbed Urica, Jackson gave him a broken pair of scissors and told him to stab her. At first Driskel did not stab her and Jackson jumped off Dana and came toward Driskel, telling him to stab her. Driskel stated that he panicked and stabbed Urica twice. At that point, Jackson pushed Driskel into the wall and started stabbing Urica. Urica called Driskel's name, but Driskel did not help her even though he wanted to. Driskel then left the apartment. When Driskel was on the stairs outside the apartment, he saw Jackson with a television set and a VCR. Jackson told Driskel to take the VCR, which he did.

Driskel denied telling anyone, "Damn, ain't no money." He testified that he acted under the threat of death from Jackson. Driskel stated that he is 5 feet 6 inches tall and weighs 150 pounds while Jackson is 6 feet 3 inches tall and weighs 275 pounds. He admitted that he never told any police officer or assistant State's Attorney during any conversation that Jackson had forced him to do anything in the apartment that night.

Also testifying at the trial was Dr. Demetra Soter, who was Urica's attending physician. Dr. Soter discussed Urica's 48 stab wounds, including one to the heart and four to her diaphragm. Urica had eight hours of surgery to repair the massive damage to her body. Urica remained in the hospital for a month and suffers permanent damage. At the time of the trial, Urica was still receiving weekly psychiatric care. Numerous photographic exhibits accompanied Dr. Soter's testimony. The defense unsuccessfully objected to the admission of the photographs as not probative of any issue in dispute and unnecessarily prejudicial.

Detective Steven Peterson testified that he investigated the murders on the morning of September 25, 1986. Vernita Winder was lying in the kitchen, Dana Winder and Mark Brown (Tiny) were in the front room, and Shirley Martin was in the bedroom. Peterson

stated that several weapons were recovered. Half a pair of scissors was found in the kitchen under the baseboard radiator. A large butcher knife with splattered blood was found in the kitchen sink. Under Mark Brown (Tiny), there was a bent knife blade with no handle. One of the living room windows had been broken and there was blood on the window, window sill, and floor below the window.

Dr. Stein, Cook County's chief medical examiner, performed autopsies on the four murder victims. Dr. Stein testified that Vernita Winder had 55 incise wounds, of which 11 or 12 were deeper stab wounds, including stab wounds to the neck, chest, interior chest, and back. There were also 14 defense wounds. Dr. Stein stated that the cause of Vernita's death was multiple stab wounds to the carotid artery in her neck, heart, and lung.

Dana Winder suffered 19 incise wounds, including five stab wounds to the chest and one stab wound to the abdomen, which caused her intestines to protrude through her abdomen. Five of the wounds were defense wounds. Dr. Stein determined that the cause of Dana's death was multiple stab wounds of the abdomen, heart, lung, and aorta.

Dr. Stein also testified that Mark Brown suffered "29 [sic]" incise wounds, of which 26 were stab wounds and five were defense wounds. There were wounds to the neck, head, interior chest wall, shoulder, arms, hand, leg, and a gaping wound to the foot. The cause of Mark's death was multiple stab wounds to the carotid artery, lung, heart, and aorta.

Shirley Martin had 15 incise wounds. Seven were stab wounds and six were defense wounds. There were wounds to her breast, neck, face, jaw, shoulder, back, chest, and hands, and a gaping wound behind her ear. Dr. Stein testified that the cause of Shirley's death was multiple stab wounds to the lung and aorta.

Several life and death witnesses testified. In addition, Alice Winder testified that when she went to the apartment in the morning and saw the bodies, Urica told her that Tiny's cousin had killed them. Tomico Winder, who discovered the bodies, also testified. Philip Sims, Jr., testified that he purchased the television and VCR from Driskel and Roland. Finally, certified statements of Driskel's convictions for burglary and robbery were entered into evidence along with photographs of the victims and the crime scene.

The trial court denied Driskel's instructions on the compulsion defense as to the murder and felony murder charges because that defense did not apply. The trial court also denied Driskel's compulsion instructions for the residential burglary and armed robbery

charges because there was no evidence presented to support such instructions. The trial court allowed a compulsion instruction relating to the aggravated battery and attempted murder of Urica Winder and home invasion involving injury to Urica Winder. The jury found Driskel guilty of residential burglary, five counts of armed robbery, four counts of murder, and aggravated battery and attempted murder of Urica Winder.

Following stipulations to Driskel's date of birth and the certified jury verdicts returned in the trial's guilt phase, the jury found Driskel eligible for the death penalty. Specifically, the jury found that Driskel had murdered two or more persons, that Vernita Winder and Mark Brown were killed in the course of another felony, and that Dana Winder was under the age of 12 and her death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.

After aggravation and mitigation was heard, the jury found mitigation sufficient to preclude the death penalty. The trial court found that Driskel's conduct was brutal and heinous and the sentences were necessary as a deterrent. Sentencing Driskel to natural life without parole on each of the four counts of murder, the trial judge stated that he was obligated by statute to impose natural life on the murder charges. On the charge of attempted murder of Urica Winder, the trial judge imposed an extended-term sentence of 60 years' imprisonment based on the brutal nature of Driskel's action. On each of the five counts of armed robbery, Driskel received 30 years' imprisonment. He also received 15 years' imprisonment on the residential burglary charge. All the sentences are to run concurrently.

Driskel argues on appeal that the defense of compulsion should apply to felony murder charges. He contends that there was no evidence presented at trial that he ever stabbed three of the four murder victims. Driskel asserts that his court-reported statement contained admissions to stabbing only Vernita Winder, who died, and Urica Winder. Therefore, he concludes, it must be assumed that the jury applied the theory that the murder occurred while he was committing a forcible felony when it found him guilty of murder on at least three of the four counts. Based on that conclusion, Driskel asserts that *People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849, which upheld the constitutionality of the compulsion defense statute, is inapplicable because it did not address the situation where the defendant agrees to participate in a felony under compulsion (to

which compulsion is a valid defense) and later murders someone in the course of that felony.

■ Driskel's entire argument is based on a misinterpretation of the evidence presented at trial. Taking the evidence in the light most favorable to the prosecution, Driskel was guilty of murdering Vernita, Tiny, and Shirley either as a principal or an accomplice. This was not a situation where Driskel was compelled to commit armed robbery and had nothing to do with the murders. In an oral statement to Detective Foley, Driskel admitted holding Shirley while Jackson stabbed her. In another oral statement, Driskel admitted that he stabbed Tiny once before the knife broke and stabbed Vernita with a knife and scissors. Driskel also gave a custodial, court-reported statement during which he admitted stabbing Tiny, breaking the knife, and stabbing Vernita with a knife and scissors.

Based on all the evidence presented at trial, the jury found Driskel guilty of murdering all four victims. The jury then found Driskel eligible for the death penalty because he had murdered two or more persons (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), that Vernita Winder and Mark Brown were killed in the course of another felony (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), and Dana Winder was under the age of 12 and her death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(7)).

The Illinois legislature specifically excluded offenses punishable with death from the compulsion defense. (*Gleckler*, 82 Ill. 2d at 154, 411 N.E.2d at 854; Ill. Rev. Stat. 1985, ch. 38, par. 7—11.) In *Gleckler*, the supreme court held that the compulsion defense is unavailable when a crime is committed under the conditions of section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) because that crime may be deemed deserving of death. (82 Ill. 2d at 159, 411 N.E.2d at 855.) The Illinois compulsion defense statute provides:

> "A person is not guilty of an offense, *other than an offense punishable with death*, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 7—11(a).

In interpreting a statute, the legislature's intent should be ascertained and given effect. (*People v. Bryant* (1989), 128 Ill. 2d 448,

455, 539 N.E.2d 1221, 1224.) The statute's language, which indicates that intent (*People v. Murphy* (1985), 108 Ill. 2d 228, 232, 483 N.E.2d 1288, 1289), must be given its plain and ordinary meaning. (*Bryant*, 128 Ill. 2d at 455, 539 N.E.2d at 1224.) Taking these rules of statutory construction into account, it is clear that the compulsion defense is not available for Driskel's actions in killing Vernita, Tiny, and Shirley. Therefore, the trial court did not err in refusing to instruct the jury on the compulsion defense as to the murders.

Even if the compulsion defense had been available for the four murders, however, Driskel would not have been entitled to jury instructions on that defense because there was no evidence presented to support such instructions. The compulsion defense is a defense only for the conduct demanded by the compeller. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 644, 534 N.E.2d 1043, 1057.) The only evidence presented to support instructions on the compulsion defense involved Driskel's stabbing of Urica Winder, who did not die. Prior to trial, Driskel never told anyone that he was compelled to perform any of the acts to which he admitted. At trial, Driskel testified that Jackson gave him a broken pair of scissors and told him to stab Urica. Driskel stated that Jackson came at him with a knife in his hand and told him that there would be no witnesses, that he was either part of it or not. Driskel testified that he then panicked and stabbed Urica because he feared that Jackson would kill him if he did not stab her. Driskel never claimed to have stabbed any of the murder victims under compulsion by Jackson.

The jury was given a compulsion defense instruction for the attempted murder and aggravated battery of Urica Winder and the home invasion involving injuries to Urica Winder. The jury rejected that defense and convicted Driskel of attempted murder and aggravated battery. Driskel was not convicted on any of the home invasion charges.

Next, Driskel argues that the admission of over 50 gruesome photographs showing the injuries of the four murder victims served no evidentiary purpose and were offered only to inflame the passions of the jury since there was no dispute as to the time, manner, or cause of death. Driskel also asserts that the cumulative effect of the gruesome photographs was to unfairly prejudice the jury against him.

Even though photographs are gruesome and inflammatory, they may be admitted into evidence if they have sufficient probative value. (*People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827, 830.) For instance, they may be admitted into evidence if they are

probative of the amount of force exerted to overpower and subdue the victims. (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 849-50, 410 N.E.2d 931, 949.) Competent evidence cannot be excluded merely because it might arouse the jury's feelings of horror and indignation. (*People v. Foster* (1979), 76 Ill. 2d 365, 375, 392 N.E.2d 6, 10.) In *Boyd*, where the defendant contended that his codefendant committed the murders alone, the court held that the gruesome photographs were relevant to whether one or two persons participated since the pictures depicted the amount of force used. *Boyd*, 88 Ill. App. 3d at 849, 410 N.E.2d at 949.

■ Similarly, the photographs in this case were probative of the amount of force exerted to overpower and subdue the victims and whether more than one person committed the offenses. They tended to show that the victims suffered a combined total of 166 incise wounds, including 73 stab wounds and 30 defense wounds.

Gruesome photographs are also admissible if they corroborate the defendant's confession that is disclaimed at trial. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 99, 245 N.E.2d 771, 777.) In Driskel's oral statement, he admitted getting a knife from a kitchen drawer and stabbing Tiny once with a knife, breaking the knife. At trial, however, he denied stabbing Tiny. Therefore, the photographs showing the broken knife found under Tiny's body and the open kitchen drawer tended to corroborate Driskel's earlier confession. In addition, the photographs tended to corroborate Driskel's pretrial statements because they were probative of the amount of force used. Driskel admitted in his court-reported statement that he stabbed Vernita, Tiny, and Urica. In one of his oral statements, Driskel admitted holding Shirley's arms and head while Jackson stabbed her. Therefore, the photographs were properly admitted due to their probative value.

Even if the photographs were erroneously admitted because of the number admitted, it would be harmless error. Because there was overwhelming evidence of Driskel's guilt in the murders, the outcome would not have been different if fewer photographs had been sent to the jury room.

Finally, Driskel asserts that Illinois' natural life imprisonment statute (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)) does not apply to a person convicted of multiple homicides based on accountability. He contends that being guilty only because he is accountable for the acts of another person is a mitigating factor not considered by the statute. Additionally, Driskel argues, interpreting

the statute to apply equally to principals and accomplices is against constitutional due process principles of fair sentencing.

Relying on general sentencing guidelines, Driskel urges this court to apply the statute only to principals. Because it is proper to consider the extent of his participation in the crime before setting the sentence (*People v. Sangster* (1981), 95 Ill. App. 3d 357, 364, 420 N.E.2d 181, 186), Driskel concludes, a mandatory sentence law applying equally to both principals and those accountable does not recognize the important principle of sentencing law of tailoring the sentence to the criminal. *People v. Schmidt* (1975), 25 Ill. App. 3d 1035, 1037, 324 N.E.2d 246, 247.

Driskel claims that *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, which upheld the validity of the natural life imprisonment statute, is inapplicable because it did not discuss the issue of less culpable codefendants. Although a person who is held accountable for the acts of another is deemed to be no less guilty than the actor, Driskel argues, he may well be less culpable and receive a lesser sentence. Driskel claims that he was less culpable than Jackson because Jackson was the one who began the killing.

■ Driskel's arguments fail because his assumption that he was only accountable for Jackson's actions in murdering the four people is without merit. In his pretrial admissions, Driskel admitted stabbing Vernita and Tiny and holding Shirley while Jackson stabbed her. Based on all the evidence, the jury found Driskel eligible for the death penalty because he murdered two or more persons, Vernita Winder and Mark Brown were killed in the course of another felony, and Dana Winder was under the age of 12 and her death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.

In the second stage of the death penalty phase, the jury found sufficient mitigating factors to preclude imposing the death penalty. Once the death penalty was not imposed, section 5—8—1(a)(1)(c) mandates that the trial judge must sentence Driskel to natural life imprisonment. (*People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047, 1050.) Section 5—8—1(a)(1)(c) states:

> "Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations: *** (c) if the defendant has previously been convicted of *** murder under any state or federal law or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of

natural life imprisonment." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(c).

The Illinois Supreme Court ruled in *Taylor* that the mandatory natural life sentence for multiple murders is not unconstitutional because the legislature considered the possible rehabilitation of an offender and the seriousness of the offense in determining that a mandatory minimum sentence of natural life imprisonment was in the public interest. (*Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062.) The court held that the rehabilitative objective of the Illinois Constitution does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crime of two or more murders. (*Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062.) Consequently, Driskel was properly sentenced.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

TULLY and GREIMAN, JJ., concur.