THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT BENNETT, Defendant-Appellant.

First District (3rd Division)    No. 1—91—2036

Opinion filed December 29, 1993.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Laura Morrison, and Marci L. Lubin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Robert Bennett, was convicted of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2). He was sentenced to concurrent sentences of 20 years' imprisonment for first degree murder and seven years' imprisonment for revocation of probation. On appeal, defendant asserts that (1) the trial court erred by barring a codefendant's testimony as a defense witness regarding conversations planning the murder; and (2) the trial court improperly permitted the State to impeach his trial testimony by his statements to a probation officer during an interview for the pretrial services report. We affirm.

At trial, Chicago police detective Joseph Guzolek testified that he was assigned to investigate a homicide at 3:15 a.m. on November 25, 1988. When Guzolek arrived at the parking lot at 6013 North Albany Street, he saw a red Camaro with the passenger door open. Mosley was sitting on the driver's side. He had been shot in the face and neck.

Chicago police officer John Cole testified that he left business cards in several locations when he was looking for defendant in conjunction with Mosley's murder. When defendant contacted Cole at 4:10 p.m. on November 28, 1988, Cole asked him to come to Area Six. After defendant arrived, Cole placed him in an interview room. Defendant was not handcuffed, but the door was locked.

At 9:55 p.m., defendant gave a court-reported statement under oath. In that statement, defendant said that he was at home on November 24, 1988, at 9:30 p.m., when his sister, Cindy Gilreath, and James Walker came to his apartment. Gilreath told defendant that she was having trouble with Mosley, then asked defendant to get a car to follow her to the motel. She promised him half a pound of marijuana for his assistance. Gilreath told defendant that she and Walker planned to rob Mosley, and Walker said, "We are going to get him. Get him. We are going to get him."

Defendant borrowed his neighbor's Green Monarch automobile. On the way to the motel, Gilreath followed him in Mosley's Camaro. Just before arriving at the motel where Mosley was staying, Gilreath stopped, rolled down the window, and told defendant that she wanted to drive up in the car. Walker said nothing, but got out of the car. Gilreath told defendant to meet her in the parking lot of the motel.

As defendant drove into the parking lot, Gilreath went into the motel. A few minutes later, Mosley and Gilreath came out of the motel, got into the Camaro, and parked the car 15 to 20 feet from defendant. Gilreath got out of the Camaro and into defendant's car. She had a garbage bag containing marijuana. When Gilreath told de-

fendant that Mosley thought he was a drug dealer, defendant understood that he was acting as a decoy.

According to his statement, defendant saw Walker get into the Camaro's backseat. Gilreath kept looking at the Camaro and motioning to Walker to pull the trigger. Defendant started to leave, but Gilreath told him to wait. Finally, Walker got out of the Camaro and walked to the driver's side, where he opened the door and fired two shots at Mosley's head.

Defendant drove away. When he arrived at the nearby Clark gas station, Walker got into the back seat of the Monarch. Gilreath kept saying, "You didn't get him," and that his head was moving. Defendant told her that Mosley's head was not moving. Gilreath wanted Walker to shoot Mosley again, but Walker said that he had killed him.

At that point, Gilreath told defendant to go home. As defendant drove away, Gilreath, Walker, and Stewart were going toward the motel. For the next three days, defendant stayed away from his home because he was scared.

The defense counsel presented an offer of proof that Stewart, a codefendant, would testify to conversations he had with Gilreath, Walker, and Todd before defendant was aware of any of their plans. Those conversations, however, were not specified. The trial court did not allow Stewart to testify to any of the out-of-court conversations because they were hearsay.

Defense counsel then called Stewart, who testified that on Thanksgiving Day 1988 at 7 p.m., Gilreath and Walker came to Stewart's workplace, which was the Clark gas station on Peterson Avenue. They were driving Mosley's red Camaro. After speaking with Stewart, Gilreath and Walker left with a bottle of HEET gasoline antifreeze.

Later, Gilreath and Walker returned. After another conversation, Stewart called Todd, who came to the gas station. He then left with Gilreath and Walker. When they returned, Gilreath and Walker were in the red Camaro and Todd was driving his own car. Todd had a .22 revolver that Stewart had sold to him. Todd gave the gun to Gilreath and Walker, who left in the Camaro.

Stewart further testified that Gilreath and Walker returned later that night. After speaking with them, Stewart again called Todd, who came to the station. Gilreath, Walker, and Todd went into the back storage room. Shortly afterwards, Stewart heard a gunshot from a test firing of the revolver. When Gilreath and Walker left the station in the Camaro, they took the revolver and a gallon of gasoline. Stewart did not see or speak with defendant during this entire time.

A couple of hours later, Gilreath and defendant came to the station in a green Monarch. Walker was not in the car. Defendant drove into the gas station and Gilreath got out of the car. She had a plastic bag in her hand and gave Stewart half a pound of marijuana.

Walker came running out of the alley and defendant left. Stewart did not talk to defendant, who had a conversation with Gilreath and Walker. Walker went back down the alley and returned, then gave Stewart the revolver.

On cross-examination, Stewart admitted that he knew the plans for the revolver when he contacted Todd about the gun for Gilreath and Walker. When defendant came to the station later that night, Stewart was told that he was returning with Gilreath from the scene of the shooting. Stewart received the marijuana, which had belonged to Mosley, for his part in the armed robbery and murder. Stewart was convicted and sentenced to 20 years' imprisonment for the armed robbery and murder.

Defendant testified that on Thanksgiving Day 1988 around 9 or 9:30 p.m., Gilreath and Walker came to his apartment. Defendant had not known that Gilreath, who is his half-sister, was in town. Gilreath was frantic and crying when she told defendant that she was having problems with Mosley. She wanted defendant to get a car so that she could pick up some clothes from the motel and stay with defendant for awhile. When Walker said, "Get him, get him," defendant was not sure what he meant because he was babbling.

Defendant borrowed his neighbor's green Monarch and followed Gilreath and Walker, who were in Mosley's Camaro. They drove to the Tip Top Motel, where Gilreath told defendant to drive into the back parking lot and wait. Defendant stated that he thought Gilreath was going to get her clothes and come to his car with them. Defendant did not see where Gilreath and Walker went.

After a few minutes, defendant saw Mosley and Gilreath park the Camaro 15 to 20 feet away. Both people appeared calm. Mosley waited while Gilreath got out of the Camaro and into the Monarch. She was carrying a green garbage bag, which she put between her legs, then sat and stared at Mosley.

When defendant looked at Mosley, he saw Walker get into the back seat behind Mosley. Defendant asked Gilreath what Walker was doing. As he got ready to start the car, Gilreath told him to wait. Defendant saw Walker get out of the car and go to the Camaro's passenger side. Gilreath put two fingers in the air and told him that Walker was going to shoot Mosley.

Defendant started his car. Then, he saw Walker fire two shots. Gilreath was jumping up and down, saying, "Let's get out of here."

Defendant drove away and went down the alley to the Clark gas station. Gilreath was crying. When defendant reached the gas station, Gilreath got out of the car and took the garbage bag with her. She told defendant that she would meet him at his house later. That was the first time that day defendant had been at the Clark gas station.

On cross-examination, defendant testified that when he was first questioned, he told Officer Cole that he did not know anything about Mosley's death. Defendant stated that he did not get any marijuana for his participation and denied telling probation officer Thomas Brosnan that he used marijuana in 1988 to cut down his use of other drugs.

After defendant saw Walker shoot Mosley in the head, he did not report the crime to the police because he was scared of Walker. Defendant explained that after sitting in the police station, he realized that Gilreath and Walker had planned to rob Mosley, but that he did not know that before he drove Gilreath to the parking lot.

He said that Gilreath told him that Walker was going to sneak up on Mosley and shoot him only a few minutes, not several minutes, before it happened. Defendant admitted, however, that he knew before he borrowed his neighbor's car that he was going to get the marijuana for doing Gilreath a favor.

Thomas Brosnan, a Cook County probation officer, testified that he interviewed defendant on September 5, 1989, in order to prepare a pretrial investigation report. During that interview, defendant told Brosnan that he had been using marijuana on and off in 1988 to come down from heroin.

After deliberations, the jury returned guilty verdicts for first degree murder and armed robbery. After defendant's motion for a new trial was denied, he was sentenced to concurrent sentences of 20 years' imprisonment for first degree murder and seven years' imprisonment for revocation of his probation.

■ On appeal, defendant asserts that the trial court deprived him of his rights to present a defense and to a fair trial when it refused to allow codefendant Stewart to testify to conversations between Stewart, Gilreath, Walker, and Todd while planning Mosley's murder. Defendant contends that the testimony is admissible under the coconspirator's exception to the hearsay rule because any alleged coconspirator statements that showed or from which it could be inferred that defendant was not a member of the conspiracy and did not know about the conspiracy should be admissible. Furthermore, defendant argues that Stewart's testimony is relevant, material, and vital to his defense.

It is not necessary for us to discuss defendant's arguments

regarding the co-conspirator's exception to the hearsay rule because Stewart's testimony is inadmissible due to irrelevancy. The test for the admissibility of evidence is whether it fairly tends to prove or disprove the offense charged. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696.) A trial court may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness. (*Ward,* 101 Ill. 2d at 455.) In determining whether a conviction must be reversed on the basis that the defendant was prejudiced by the exclusion of evidence, a reviewing court considers the entire record to determine if the rejected evidence could have reasonably affected the verdict. *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 60, 452 N.E.2d 32.

After considering the entire record, we hold that the excluded evidence would not have reasonably affected the verdict. Any evidence of conversations that occurred before Gilreath came to defendant's apartment is irrelevant to the issue of defendant's guilt or innocence. Defendant's acts, as presented in his court-reported statement and trial testimony, prove his culpability for the crime, which would not be negated by any earlier conversations between codefendants.

At trial, defendant denied knowing about the plan to kill Mosley until moments before the shooting. He admitted, however, that his court-reported statement was true except that Walker did not get into the Monarch at the gas station after the shooting. Determinations of credibility of witnesses and the weight to be given to their testimony are exclusively within the province of the jury. (*People v. Mullen* (1990), 141 Ill. 2d 394, 403, 566 N.E.2d 222.) Any conflicts in the testimony are to be resolved by the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.) Therefore, we conclude that the trial court did not err in barring Stewart's testimony about out-of-court conversations concerning the plan to murder Mosley.

■ Next, defendant asserts that the trial court improperly permitted the State to impeach his trial testimony with statements he made to a probation officer during an interview for the pretrial services report. The trial court denied the request. During closing arguments, the State urged the jury to consider the fact that defendant was a drug user and abuser.

Contrary to the State's assertion, this issue has not been waived. Although there was not a proper objection when defendant was questioned about his statements during cross-examination and there was no objection during the probation officer's testimony, there was a proper objection to the use of that information during closing arguments.

Since there are no cases regarding section 11 of the Pretrial Ser-

vices Act (Act) (Ill. Rev. Stat. 1991, ch. 38, par. 311), defendant analogizes it to Supreme Court Rule 402(f) (134 Ill. 2d R. 402(f)) and *People v. Benniefield* (1980), 88 Ill. App. 3d 150, 155, 410 N.E.2d 455, which ruled that the defendant's statements during a plea negotiation cannot be used to impeach him during trial.

In response, the State asserts that statements made during the course of a pretrial interview may be used for impeachment purposes even though their use for evidentiary purposes is limited. The State relies on *Harris v. New York* (1971), 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645, where the Court held that statements made by a defendant in violation of his *Miranda* rights can be used for impeachment purposes because a defendant's constitutional rights do not include the right to commit perjury.

We decline to apply either *Benniefield* or *Harris* to this case. Instead, we will interpret the Pretrial Services Act, which provides that the pretrial services report is an aid to the court in determining the possible pretrial release of the accused.

In interpreting a statute, the legislature's intent should be ascertained and given effect. (*People v. Bryant* (1989), 128 Ill. 2d 448, 455, 539 N.E.2d 1221.) The statute's language, which indicates that intent, must be given its plain and ordinary meaning. (*People v. Murphy* (1985), 108 Ill. 2d 228, 232, 483 N.E.2d 1288; *People v. Driskel* (1991), 224 Ill. App. 3d 304, 314, 586 N.E.2d 580.) If the words of the statute are unambiguous, the court will not look to extrinsic aids such as legislative history. *People v. Drakeford* (1990), 139 Ill. 2d 206, 214, 564 N.E.2d 792; *Lindley v. Murphy* (1944), 387 Ill. 506, 515, 56 N.E.2d 832.

Section 11 of the Act provides:

"No person shall be interviewed by a pretrial services agency unless he or she has first been apprised of the identity and purpose of the interviewer, the scope of the interview, the right to secure legal advice, and the right to refuse cooperation. Inquiry of the defendant shall carefully exclude questions concerning the details of the current charge. Statements made by the defendant during the interview, or evidence derived therefrom, are admissible in evidence only when the court is considering the imposition of pretrial or posttrial conditions to bail or recognizance, or when considering the modification of a prior release order." (Ill. Rev. Stat. 1991, ch. 38, par. 311.)

This language clearly and unambiguously bars any statements made during the interview from being used for impeachment purposes at trial.

Furthermore, the use of a defendant's statements as impeachment

evidence would have a chilling effect on the stated purpose of the Act, which is

> "to provide the court with accurate background data regarding the pretrial release of persons charged with felonies and effective supervision of compliance with the terms and conditions imposed on release." Ill. Rev. Stat. 1991, ch. 38, par. 301.

The Act's intent is to encourage a defendant to speak freely with the probation officer. If statements to pretrial services officers could be used at trial for impeachment purposes, defendants would be reluctant to cooperate or would be discouraged from providing accurate information. Therefore, the trial court erred when it allowed defendant to be impeached by his statements to the probation officer.

Even though the trial court erred by allowing defendant to be impeached by his statements during the pretrial services interview, we find that the error is harmless. We have considered the totality of the evidence presented and can safely conclude that a trial without this error would produce no different result. *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29, 413 N.E.2d 1254.

Based on the foregoing, the circuit court judgment is affirmed.

Affirmed.

RIZZI, J., concurs.

JUSTICE GREIMAN, dissenting:

The majority has correctly determined that allowing defendant to be impeached by his statements made to a probation officer during his pretrial services interview was error; however, I must dissent from the view that such error is harmless.

The subject matter of the impeachment was defendant's use of a controlled substance, certainly an issue likely to reflect badly upon defendant during the jury's deliberations. Drug use is a crime and "[t]he erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 140, 402 N.E.2d 238, citing R. Traynor, The Riddle of Harmless Error 63 (1970).) Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish his propensity to commit crime because it "overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment." *People v. Richardson* (1988), 123 Ill. 2d 322, 338-39, 528 N.E.2d 612.

Under limited circumstances, drug use may be relevant to impeach a witness' ability to observe and narcotics addiction may be

relevant to undermine a witness' credibility. (*People v. Willis* (1992), 235 Ill. App. 3d 1060, 1073, 601 N.E.2d 1307.) In *Willis*, the defendant contended that the State had improperly cross-examined him on whether he had a drug problem. The appellate court agreed with the defendant under the facts of the case but did not reverse defendant's conviction of mob action, reasoning that sufficient proper evidence sustained the conviction and, since defendant had a bench trial, the trial court is presumed to have considered only competent and proper evidence. The *Willis* court also noted that no proof of drug use or a drug problem was presented.

In *People v. Ingram* (1980), 91 Ill. App. 3d 1074, 415 N.E.2d 569, this court held that the defendant had been improperly cross-examined about pretrial statements which he made to a probation officer concerning his use of heroin. The defendant admitted on cross-examination that he had used cocaine but steadfastly denied using heroin. The defendant's admission of heroin use had been made to the probation officer as part of a pretrial investigation report in contemplation of a plea bargain. *Ingram* found that such discussions are protected by Supreme Court Rule 402(f), which provides now, as it did at the time of the *Ingram* case, that:

> "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, *** neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." 134 Ill. 2d R. 402(f).

However, the defendant's conviction of aggravated battery was not reversed in *Ingram* because, like *Willis*, the trial was a bench, not jury, trial where the judge is presumed to have considered only competent evidence absent an affirmative showing to the contrary. Moreover, in *Ingram*, the probation officer's report was not admitted into evidence and the probation officer was not called as a witness to perfect the impeachment.

Like the defendant in *Ingram*, who admitted the use of cocaine but denied the use of heroin, defendant in the case at bar admitted that he expected to receive marijuana in exchange for doing Gilreath a favor but denied the use of marijuana to reduce his use of other drugs.

As the disclosure of drug use by the defendants during cross-examination in *Willis* and *Ingram* was improper, so also has it been held to be improper in the present case. In the present case, however, the error was compounded by the additional testimony of the probation officer.

Unlike the defendants in *Willis* and *Ingram*, defendant in the

present case was tried by a jury where the improper infusion of defendant's drug use into the trial can only be viewed as highly prejudicial in the eyes of the jurors. The prejudicial impact of improperly admitted evidence is more likely to occur in a case decided by a jury as opposed to a judge. *Lindgren*, 79 Ill. 2d at 140.

The majority suggests that it affirms because it has "considered the totality of the evidence." (257 Ill. App. 3d at 306.) In that event, it should be led to a different conclusion. This case, by any measure, is close.

My reading of the evidence is that defendant is a not-too-bright individual who is in the wrong place at the wrong time but does not seem to be part of the intricate criminal web that his codefendants developed. The conversations to which the codefendant was prepared to testify were verbal acts and should have been admitted as such rather than for the truth or falsity concerning defendant's nonparticipation in any part of the planning stages of the charged crimes.

Moreover, as the majority clearly recognizes, there is a strong public policy to encourage a defendant to speak freely and candidly to his probation officer. I believe that the need for candid exchange of information between a defendant and a probation officer is inherent in both Supreme Court Rule 402(f), which prohibits the admission of a defendant's statements made during plea negotiations, and section 11 of the Pretrial Services Act, which also generally bars such statements as evidence. Allowing impeachment through the use of such statements, finding such to be error and then determining it to be harmless is not likely to send an appropriate message with regard to the treatment to be accorded statements made to a probation officer.

Accordingly, I would reverse and remand for a new trial.