THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELMER WOOD, Defendant-Appellant.

Second District   No. 77-264

Opinion filed June 13, 1979.

Robert S. Bailey, of Chicago, for appellant.

Gene Armentrout, State's Attorney, of Geneva (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

The defendant, Elmer Wood, was convicted of the murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) of his former wife Marilee Wood after a bench trial in the Circuit Court of Kane County and was sentenced to a term of 15 to 45 years imprisonment. On appeal the defendant raises issues as to the admission and consideration by the trial court of evidence of prior threats against the decedent by the defendant and the court finding the evidence sufficient to support a conviction for murder instead of voluntary manslaughter. We affirm.

The evidence included testimony of the defendant's son Dale M. Wood, a senior law student, that his father and mother were divorced in September 1976, the month preceeding the murder of his mother on October 23, 1976. On March 15, 1976, while he and his fiancee were in the Wood family residence he walked into the living room where he observed his father "holding a shotgun on my mother." His father was telling his mother how he felt he had been wronged during their marital relationship. His father had his finger on the trigger, refused to put the shotgun down and the witness had to take the shotgun away from his father. His father said to Wood's mother "I swear if you ever leave me, I'll follow you to the ends of the earth and kill you."

Dale M. Wood also testified that on May 24, 1976, he became upset over what he considers were rude actions by his father. His mother agreed with him that his father's actions were rude. The father complained that his mother always took Dale's side and she and Dale were always against him, and said she was not strong enough to stop a shotgun. The witness testified he thereafter followed his father upstairs where he observed two shotguns lying on the bed, one of which had been removed from its case. The witness said he needed the help of his friend, Bill Lane, to take the gun away from his father. There were two shotgun shells on the dresser. Another incident was testified to by William Saracco who said the defendant stated during an argument in Saracco's home he would get the decedent when he got home and that he would kill her.

Other testimony included that of Howard Gaedt who testified he discussed purchasing a shotgun with the defendant in September 1976. On October 17, 1976, he obtained a shotgun for the defendant which he placed in a brown paper bag. He also purchased two boxes of shotgun

shells for the defendant. He saw the defendant on October 23, 1976, when the defendant told him the gun worked real good and gave him two pellets which the defendant told him were from the shotgun shell. The defendant asked the witness to hold onto the shotgun for him.

Other evidence at the trial included testimony of two neighbors of the decedent who observed the defendant in the vicinity of the family home in the afternoon prior to the murder carrying a brown paper bag. There was testimony of a United States Treasury Special Agent that he had received a telephone call from witness Gaedt who told him of the whereabouts of the defendant which led to his arrest the day after the killing. Gaedt gave the treasury agent a jacket, two pellets and a brown paper bag containing a shotgun.

Additional testimony from forensic experts established the cause of death and the condition of the crime scene. The shot which killed the decedent was fired from four to six feet from her. A Carpentersville police officer testified that following his arrest the defendant was given the Miranda warnings. The defendant, after first denying that he had been at his wife's residence on the day of the occurrence, admitted he had gone to the house to pick up some belongings including a shotgun. The officer testified that the defendant said his ex-wife came up to and pushed him causing the shotgun to discharge. According to the officer the defendant denied cutting the telephone cord and said that after the shooting he walked to a telephone in the Meadowdale Shopping Center to call the fire department, and thereafter carried the shotgun back to Chicago in a brown paper bag.

An assistant state's attorney and a police detective testified that the defendant admitted putting the shotgun together in the home but alleged the gun discharged after his ex-wife had pushed him. He told the assistant state's attorney he was "worked up or mad" while he was in the house before the shooting.

The defendant testified that on October 23, 1976, he took a train from Chicago to Elgin and a taxi from Elgin to Carpentersville (later he testified it was a bus) and walked from the intersection of Route 25 and Hazzard Drive to his home. He found his ex-wife was not at home and he went to the shopping center and purchased a soft drink in a brown paper bag which was smaller than the one in evidence. Upon returning to the home he found his ex-wife had returned, she let him in and offered him a drink. He told her that he was waiting for someone to pick up his belongings which had been placed on the driveway. He told her he wanted to check the basement for additional belongings. They engaged in an argument but she left to change clothes and he went to the basement.

The defendant further testified that upon examining the crawl space he saw that his assembled "rifle" was still there along with two boxes of ammunition in a brown bag (but not the one in evidence). His wife was in the kitchen and met him at the front door room and asked him what he was going to do with the shotgun to which he responded that he was taking it back to Chicago. He said she didn't seem to care that someone might take his belongings and, in the excitement she started hollering. He then planned to leave whether "the guy" was there or not, but wanted to call him. She said you're not going to take "* * *" this and that, even take this shotgun with you because you figure you're going to hurt yourself"; and, "Well, she came at me and that was it. It was fired. The firearm went off, the rifle, and I was just holding it." The witness later clarified his testimony to the effect that when he said rifle he meant shotgun.

The defendant testified that after the shooting he placed pillows under his ex-wife. She asked him to take her car for help but he declined saying he couldn't drive. On cross-examination it was revealed that he didn't have a driver's license and was concerned about driving in Carpentersville without one. He disassembled the shotgun and placed it in the brown paper bag in evidence, picked up two shotgun pellets, and walked to the Meadowdale Shopping Center with the shotgun in the bag to call the police and fire department. He saw them leave the station for his wife's home, returned to Elgin and took a train back to Chicago.

The defendant denied aiming the shotgun at his wife. He denied ever threatening her with a gun or threatening to kill her. William Lane testified in rebuttal that he had searched the decedent's home on October 16, 1976, including the crawl space and found no weapons anywhere in the house.

On appeal the defendant raises two issues as the basis of a reversal or a reduction in the classification of the offense from murder to voluntary manslaughter and remand for resentencing. The defendant argues that the long-established rule allowing into evidence prior threats by a defendant against the decedent should be construed in the context of the circumstances of each case. Defendant concedes the holdings in cases as far back as 1886 that evidence of prior threats against a decedent by the defendant are admissable. (*Schoolcraft v. People* (1886), 117 Ill. 271, 7 N.E. 649; *Painter v. People* (1893), 147 Ill. 444, 35 N.E. 64; *People v. Slaughter* (1963), 29 Ill. 2d 384, 194 N.E.2d 193; *People v. Jayne* (1977), 52 Ill. App. 3d 990, 368 N.E.2d 422; *People v. Howell* (1977), 53 Ill. App. 3d 465, 368 N.E.2d 689.) He suggests that in a case such as the one before us the testimony of the son of the defendant of the prior taking up of arms and threats by the defendant against the decedent were so prejudicial as to outweigh its probative value.

■■ We disagree. The testimony of the son and William Saracco were central to establishing the defendant's intent, an issue of great importance in light of the defendant's defense that the shooting was accidental. Without that evidence, the defendant's defense of accident would be substantially more credible in spite of the testimony of Howard Gaedt concerning the acquisition of the shotgun and ammunition prior to the shooting. *People v. Watkins* (1975), 34 Ill. App. 3d 369, 340 N.E.2d 92.

Nor do we subscribe to the defendant's argument that the threats made seven months before the homicide were too remote to be admissible. Threats made over a year before the occurrence have been held admissible. (*People v. Griswold* (1950), 405 Ill. 533, 92 N.E.2d 91.) The passage of time goes to their probative value to the trier of fact not to their admissibility. *People v. Jayne* (1977), 52 Ill. App. 3d 990, 368 N.E.2d 422.

Finally, the defendant argues the inconsistency of the trial court's consideration of seven-month-old prior threats and the trial court's apparent failure to consider the one-week-old alleged provocation so as to reduce the charge of murder to the lesser included offense of voluntary manslaughter. The alleged provocation is characterized as the taking up of residence in the defendant's former home by William Lane, a friend of the son of the defendant and decedent. The defendant observed William Lane emerge from taking a shower in the home about one week before the killing.

■■ We find no inconsistency. The admission into evidence of the prior threats was pursuant to well established Illinois law. As a matter of law Mr. Lane's activities could not provide the basis for the provocation relied upon by the defendant for such acts must cause the killer to act under a "sudden and intense passion resulting from serious provocation * * *." (Ill. Rev. Stat. 1975, ch. 38, par. 9—2; *People v. Jacobs* (1976), 44 Ill. App. 3d 290, 357 N.E.2d 821.) The defendant's citation of *People v. Free* (1976), 37 Ill. App. 3d 1050, 347 N.E.2d 505, and *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218, have no application here as they relate to adultery constituting provocation. In the case at bar the defendant was no longer married to the decedent at the time of the suggested "adulterous" acts and therefore defendant cannot suggest adultery as provocation in this case. We conclude that the one week intervention between the conduct of William Lane and the killing of his wife takes defendant outside the conduct required under the voluntary manslaughter statute. A one week interval is time enough for cooling of one's "sudden and intense passion." Absent this essential element the trial court properly concluded that the evidence did not support a judgment of conviction for voluntary manslaughter. *People v. Wilson* (1972), 3 Ill.

App. 3d 481, 278 N.E.2d 473; *People v. Love* (1969), 108 Ill. App. 2d 97, 247 N.E.2d 40.

Accordingly, we decline to reduce either the degree of the offense, or the sentence. The judgment of the Circuit Court of Kane County is affirmed.

Affirmed.

GUILD, P. J., and WOODWARD, J., concur.