THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD FORCUM, Defendant-Appellant.

Fifth District   No. 5—01—0692

Opinion filed November 7, 2003.

430

KUEHN, J., dissenting.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and T. David Purcell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DONOVAN delivered the opinion of the court:

Defendant, Donald Forcum, appeals the order of the circuit court of Jackson County, sentencing him to natural-life imprisonment for first-degree murder, 30 years' imprisonment for attempted first-degree murder, 30 years' imprisonment for armed violence, and 30 years' imprisonment for home invasion. On direct appeal to this court, defendant raises three issues: (1) whether a special interrogatory denied defendant a fair trial where the subject of the interrogatory—whether the crime was committed in an exceptionally brutal or heinous manner—was not an element of the offense, (2) whether defendant was denied a fair trial due to the repetition and emphasis of prejudicial evidence, including gruesome photographs, hearsay, the attribution of the decedent's mental state, and the presentation of a letter and a taped message during the State's closing argument, and (3) whether his convictions for home invasion and armed violence should be vacated because they violate the one-act, one-crime rule. For the following reasons, we affirm defendant's convictions and sentences for first-degree murder, attempted first-degree murder, and home invasion, and we vacate defendant's conviction for armed violence.

## BACKGROUND

This case involves the brutal murder of a young woman, Renee Di-Cicco, and the savage attempted murder of Renee's new boyfriend, Brett Janecke, by defendant, Renee's former boyfriend. Defendant and Renee lived together in Carbondale for a period of time during their involvement in the house Renee resided in at the time of her

murder. The relationship ended in the spring of 2000. After the breakup, Renee was introduced by her cousin to a man named Brett, who lived in Chicago. Renee and Brett began a long-distance relationship, talking on the phone several times a week. A few weeks before her murder, Renee visited Brett in Chicago. After this visit, Brett sent Renee roses. Shortly after sending the roses, Brett began to receive intimidating and threatening messages on his answering machine. Among other things, the caller stated that he was not "Renee's ex [*sic*]" but was "her current and forever lover." Brett called Renee about the messages and asked Renee, "[W]ho is this psycho pussy calling me on my answering machine?"

On Wednesday, June 7, 2000, Renee returned home from a trip to find a 22-page letter waiting for her from defendant. The rambling letter showed defendant's anger and hatred toward Renee. In this letter, defendant called Renee names such as tramp, liar, whore, enchantress, and harlot. Defendant expressed his anger over the breakup and his feelings of betrayal. Finally, defendant concluded the letter with a warning about what he would do if she attempted to contact him: "[I will] come crashing down upon the heads of *** Brett [and others] with a thunderous vengeance and furious anger and they will know that my name is Houdini because I can disappear and reappear just like magic you see, and no man nor [*sic*] beast nor [*sic*] nothing [*sic*] man-made can either hold or contain me." After reading the letter, Renee became upset and contacted Brett for comfort. The next day, Thursday, June 8, 2000, Brett arrived in Carbondale to visit Renee.

On Friday, June 9, 2000, Renee worked until 3 p.m. After work, Renee and Brett spent the rest of the afternoon canoeing and swimming. They ate dinner at Quatro's Pizza and then picked up a bottle of wine. They returned to Renee's apartment around 11 p.m., consumed some wine, talked for a while, and then fell asleep on the couch.

Brett testified that during the early morning hours of Saturday, June 10, 2000, he woke from his sleep on Renee's couch to Renee asking, "What are you doing, Donnie?" Prior to this, Brett had not heard any knocking at the door or heard any sounds of a break-in. Brett got up off the couch and saw the arm of someone in the apartment. The intruder told Brett, "Now you get to call me a psycho pussy to my face." Brett recognized the voice to be the same as the voice that had left the threatening messages on his answering machine. At that point, an object hit Brett twice on the side of his head. He fell to the couch with his knees on the cushions, his hands on the back of the couch, and his back to defendant. Seconds after his fall onto the couch, an object flashed in front of Brett's face, and he reached out to grab it.

Defendant pulled it away and the object cut deep into the flesh on Brett's hand. The knife came slashing down again at Brett, and as he tried to duck his chin down, the knife sliced through his lip over his teeth and over his eye. Renee was screaming and then Brett felt something cut through his neck. Blood started to flow down Brett's chest and back. Renee then tried to get in between defendant and Brett. She jumped on Brett's neck, and the weight caused him to start to fall down. Although Brett began to feel lightheaded from the loss of blood, he tried to catch himself on the arm of the couch and he kicked at defendant. He fell to the ground and could not get back up. He lay on the floor unable to move, blood streaming from his neck and face.

Brett then heard Renee ask: "Am I going to die now? Am I going to die now?" To which he heard defendant respond, "Yes, you're going to die now, [b]itch." Brett then heard a gurgling noise coming from the direction of Renee. Renee's hand, which had been holding Brett's toe, went limp. Defendant then walked to where Brett lay, hit him on the head, and stated, "Told you not to fuck with me, you son of a bitch." Brett heard defendant drag Renee into another part of the house. Brett was unable to move because he was lightheaded from blood loss.

Brett testified that he then heard defendant return to where he was lying. Although Brett was conscious, he was unable to move, due to his injuries. Defendant started slashing at Brett's neck with the knife. Brett lay on the floor, taking the pain and unable to move. Defendant finally stopped cutting into Brett, walked to another part of the room, and then moments later walked back to Brett and said, "I'll see you in hell." Defendant then walked out the back door.

Renee's neighbor, Cecilia Potter, testified that while she was sitting in her living room, she heard banging and crashing coming from Renee's house. Cecilia and her mother ran outside to see what was happening and observed the walls of Renee's house shaking and items falling off of Renee's porch and heard what sounded like people stomping around inside. They heard Renee scream and then silence. They ran inside and called 9-1-1.

Officers responded to the 9-1-1 call. Inside Renee's apartment, the officers found Brett lying on the floor. At first, they thought he was dead, but he mumbled and they realized he was still alive. Before the ambulance arrived to take Brett to the hospital, Brett told one of the officers that the attacker had mail at the apartment with his name on it. The officer followed a trail of blood that led them to Renee's bedroom. Officers found that a full-length mirror attached to the wall near the entrance to Renee's bedroom was shattered and there were blood smears on the wall. Renee's dead body was lying on her bed. She

lay on her back on the bed with her knees bent and hanging over the side of the bed. She was covered in blood and knife wounds. The shorts she had been wearing had been removed and were wrapped around her right wrist, and her arms were lying above her head.

Renee had numerous deep, gaping defensive cuts on her forearms and hands. She had cutting wounds on her right shoulder, bruises on her thighs, a stab wound on her foot, and multiple deep-cutting wounds on her face and thighs. Defendant had made multiple slashes with his knife across the soft tissues of Renee's neck, which had sliced all of the flesh around Renee's neck except for one small, one-inch section in the back of her neck. Defendant's knife cut through Renee's skeletal muscle in her neck, her voice box, her windpipe, and the two jugular veins on either side of her neck. The knife nicked the bone of her spine. Renee died of blood loss from the multiple cutting wounds that she had received to her face, neck, chest, and extremities.

There were no signs of forced entry at Renee's apartment. In the living room, police found a large pool of blood, clumps of Renee's hair on the floor, and splatters of blood on the television, couch, and walls. A blood trail with drag marks led back into Renee's bedroom. A Band-Aid box and Band-Aid wrappers were on the floor covered in blood and fingerprints. A blood trail led into the bathroom. The floor and vanity in the bathroom were covered with blood drops. There was also an open box of matches and a can of paint thinner. Defendant's latent fingerprints were found on the paint thinner. Brett testified that prior to his falling asleep that night, the blood-covered Band-Aid box had not been lying on the living room floor and the matches and paint thinner had not been present in the bathroom. In the kitchen area, there was a trail of blood leading toward the back door to the back porch area of the house, and the officers found defendant's bicycle outside, near the back door.

Investigators searched defendant's residence and found a used Band-Aid on his dresser. In addition, they found a bloodstain in the sink area of his bathroom. They collected defendant's boots, which were found on a deck outside his home. A DNA test of a portion of one of the shoelaces from his boot revealed a bloodstain that contained a mixture of DNA profiles. A DNA profile consistent with Renee's DNA was the major contributor to the bloodstain. Later on the same day of the attack, defendant was arrested and processed at the Jackson County jail. A jail nurse noticed a cut on one of defendant's index fingers and multiple abrasions on defendant's arms and back. The jailer who booked defendant also noticed that defendant had several scrapes on his back and under his arms, scratches on his legs, and a big cut on his index finger which was still freshly bleeding.

A forensic scientist analyzed the DNA of the blood on the Band-Aids found lying on Renee's living room floor and discovered a mixture of DNA profiles, with one major contributor. Defendant could not be excluded as the major contributor, and the scientist calculated the statistical number of people in the Caucasian population that could not be excluded was 1 in 940 billion. The scientist concluded that defendant was the likely donor of the DNA profile found on the Band-Aid box.

One of defendant's roommates testified that she saw defendant leave the house at approximately 10:30 p.m. on June 9, 2000. Defendant stated that he was going to a bar called The Cellar, in Carbondale. Defendant did not have a car but had access to a roommate's bicycle that defendant frequently used for transportation.

Several witnesses testified that they saw defendant at The Cellar after 10 p.m. None of them saw any cuts or bandages on defendant's hands at that time. Defendant left The Cellar around midnight. His roommate testified that he saw defendant return home about 12:30 a.m. and leave a short time later with a gym bag. Defendant returned to The Cellar at approximately 12:50 a.m. and left again sometime before closing.

Following a jury trial on May 25, 2001, defendant was convicted of first-degree murder, attempted first-degree murder, armed violence, and home invasion. The jury also found that the State had proved beyond a reasonable doubt that defendant had committed the offenses by exceptionally brutal or heinous behavior indicative of wanton cruelty. As a result, the trial court sentenced defendant to an extended term of natural-life imprisonment for first-degree murder, 30 years' imprisonment for attempted first-degree murder, 30 years' imprisonment for armed violence, and 30 years' imprisonment for home invasion.

## ANALYSIS

### Special Interrogatory

Defendant first argues that the court and the prosecutor violated the separation-of-powers doctrine by altering the elements of the offense of first-degree murder and violated the prohibition against *ex post facto* laws by the use of a special interrogatory.

Prior to the May 2001 trial, the State filed a notice of intent to seek an extended-term sentence. The State alleged that the offense charged in the information had been accompanied by exceptionally brutal and/or heinous behavior indicative of wanton cruelty. At the time of the instant offenses, the brutal or heinous character of a crime was not an element of any charged offense but was a matter for judicial

consideration at sentencing. 730 ILCS 5/5—5—3.2(b) (West 2000). This brutal or heinous nature of a crime had been determined by legislative act to be a reason to impose an extended-term sentence. 730 ILCS 5/5—5—3.2(b) (West 2000). In order to comply with the requirement of finding the extended-term factor of brutal and heinous behavior beyond a reasonable doubt as required by *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the State tendered a special interrogatory, which stated, in part: "Has the State proven beyond a reasonable doubt that the offense was committed by exceptionally brutal or heinous behavior indicative of wanton cruelty?" The jury answered in the affirmative, and based on its finding, the court sentenced defendant to an extended term of natural-life imprisonment for first-degree murder.

This court must first determine whether section 5—5—3.2(b) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—5—3.2(b) (West 2000)), as it existed on the date of the crime, was unconstitutional, based on *Apprendi*, because the statute fails to require proof of brutal or heinous behavior beyond a reasonable doubt. The answer is that the statute was not and is not unconstitutional if the finder of fact, in this case the jury, is required to determine the aggravating factor beyond a reasonable doubt. This conclusion is based on *People v. Thurow*, 203 Ill. 2d 352, 366, 786 N.E.2d 1019, 1027 (2003).

The defendant in *Thurow* was charged, under sections 9—3(a) and (f) of the Criminal Code of 1961 (720 ILCS 5/9—3(a), (f) (West 1998)), with involuntary manslaughter of a family or household member. The jury found defendant guilty after it had been instructed on the elements of involuntary manslaughter. The sentencing judge determined that the defendant was eligible for an enhanced sentence because the victim was a member of the defendant's household (720 ILCS 5/9—3(f) (West 1998)). Alternatively, the sentencing judge determined that the defendant was eligible for an extended-term sentence based upon the young age of the victim (730 ILCS 5/5—5—3.2(b)(4)(i) (West 1998)). As a result, the trial court sentenced the defendant to 8 years in prison, a sentence within both the 3- to 14-year enhanced sentencing range (720 ILCS 5/9—3(f) (West 1998)) and the 5- to 10-year range for an extended-term sentence (730 ILCS 5/5—8—2(a)(5) (West 1998)). The appellate court vacated the sentence, on the basis that it violated *Apprendi*, and remanded for a new sentence not to exceed the five-year statutory maximum for the Class 3 felony of simple involuntary manslaughter. *People v. Thurow*, 318 Ill. App. 3d 128, 742 N.E.2d 880 (2001). The Illinois Supreme Court affirmed the appellate court's judgment that the defendant's enhanced sentence had been imposed

in violation of *Apprendi*, but it reversed the appellate court's order vacating the sentence and affirmed the eight-year sentence imposed on the defendant by the trial court, because the error was harmless considering the overwhelming nature of the uncontradicted evidence in support of the enhancing element. *Thurow*, 203 Ill. 2d 352, 786 N.E.2d 1019.

As a part of its analysis in *Thurow*, the court found that section 9—3(f) was constitutional and was not void *ab initio*. The court stated:

"There is no indication here as to the evidentiary standard that is to be applied in making the household-member determination. Under section 9—3(f), this finding could be made by a preponderance of the evidence. However, it also could be made based upon proof beyond a reasonable doubt. Under *Apprendi*, a finding, based upon a preponderance of the evidence, that the victim was a member of defendant's household could not form the basis for an enhanced sentence. As noted, such a procedure would be unconstitutional. However, there is no violation if this determination is made beyond a reasonable doubt. Because this latter, constitutionally correct procedure is allowed by section 9—3(f), it cannot be said that there is no set of circumstances under which the statute would be valid. See *In re C.E.*, 161 Ill. 2d [200,] 210-11[, 641 N.E.2d 345, 350 (1994)]. Section 9—3(f) is not unconstitutional on its face. Accordingly, we reject defendant's contention that section 9—3(f) is void *ab initio*." *Thurow*, 203 Ill. 2d at 368, 786 N.E.2d at 1028.

*Apprendi* does not require that section 5—5—3.2(b)(4)(i) of the Unified Code be considered unconstitutional if the correct standard of proof is applied in determining the aggravating factors. *Apprendi* stands for the following proposition: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[ ] and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. That is exactly what occurred in this case. At the trial, the question of whether the crime had been committed in a brutal or heinous manner was submitted to a jury and proved beyond a reasonable doubt through the use of a special interrogatory.

We find the recently decided cases of *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), and *People v. O'Quinn*, 339 Ill. App. 3d 347, 791 N.E.2d 1066 (2003), to be instructive. In *Crespo*, the Illinois Supreme Court held that a 75-year, extended-term, prison sentence based on the brutal and heinous nature of the crime was not error. On rehearing, the defendant asked the supreme court to vacate his extended-term sentence because the circuit court had not complied with *Apprendi*. In a supplemental opinion filed upon the denial of

rehearing, the court declined to reverse the sentence, holding that any error that might have occurred did not rise to the level of plain error because the evidence overwhelmingly showed that the crime had been brutal and heinous and there was no basis for concluding that the jury would not have found that the crime had been committed in a brutal and heinous manner indicative of wanton cruelty.

In *O'Quinn*, we held that the State's use of a special interrogatory to determine the age of the victim beyond a reasonable doubt did not violate any of the defendant's constitutional rights. *O'Quinn* involved the prosecution of a defendant for the murder of a 13-month-old child. Section 5—5—3.2(b)(4)(i) of the Unified Code (730 ILCS 5/5—5—3.2(b)(4)(i) (West 2002)) allows for the court to impose an extended-term sentence when the victim is under the age of 12. At various times throughout the trial, testimony was presented that the victim was 13 months old. In order to comply with *Apprendi*, the State tendered a special interrogatory asking the jury: " 'If you have found the defendant guilty of first-degree murder[,] do you also find that the victim, Emmarld Jade Jackson Bradley[,] was under the age of twelve at the time he committed the offense?' " *O'Quinn*, 339 Ill. App. 3d at 359, 791 N.E.2d at 1076. The jury answered in the affirmative. Based on this finding, the trial court sentenced the defendant to an extended-term sentence of 70 years' imprisonment. We affirmed.

■ Based on *Crespo* and *O'Quinn*, we hold that the court did not err in the allowance of the use of the special interrogatory. In fact, we find the facts in our case make it easier to reach this conclusion compared to *Crespo*, where the jury did not even find the element of brutal or heinous behavior beyond a reasonable doubt and the Illinois Supreme Court still found there to be no prejudicial error. In our case, the element of brutal or heinous behavior was found by each and every juror. We conclude that the court was acting in its express authority in allowing the use of the special interrogatory and that the interrogatory caused no harm or prejudice to defendant. See *People v. Testin*, 260 Ill. App. 3d 224, 235, 632 N.E.2d 645, 652 (1994) ("Although the use of special interrogatories in criminal cases is not favored, they have been used without harm or prejudice to the defendant"); see also *United States v. Ross*, No. 99 CR 469 (N.D. Ill. March 22, 2002) (memorandum opinion and order) (since the decision in *Apprendi*, federal district courts have proceeded by submitting special interrogatories to the jury for a determination of drug type and quantity). In order to comply with the mandate of *Apprendi*, it was imperative that the State have the jury find the age of the victim beyond a reasonable doubt. Had the State not done so, upon sentencing, defendant may not have been eligible for an extended-term

sentence. But see *Thurow*, 203 Ill. 2d at 368, 786 N.E.2d at 1028 (an *Apprendi* violation is subject to harmless error analysis). The State's use of a special interrogatory to determine the age of the victim beyond a reasonable doubt complies with *Apprendi*, does not violate any of defendant's constitutional rights, and causes no prejudice to defendant.

Additionally, defendant claims that the court and the prosecutor violated the prohibition against an *ex post facto* application of the law "by adding an element of the offense at trial." Defendant argues that because the *ex post facto* prohibition prohibits the legislature from retroactively altering the definition of a crime or increasing the punishment for a criminal act, his case should have been governed by the law in effect at the time of the offense.

■ As a result of *Apprendi*, the Illinois legislature amended the extended-term statute. Pub. Act 91—953, § 10, eff. February 23, 2001 (amending 730 ILCS 5/5—8—2(a) (West 1998)); see also *People v. Swift*, 202 Ill. 2d 378, 386 n.1, 387 n.2, 781 N.E.2d 292, 296 n.1, 297 n.2 (2002). After the amendment, the section stated that where a "trier of fact" finds "beyond a reasonable doubt" the presence of one of the factors in aggravation set forth in section 5—5—3.2(b) of the Unified Code, the judge may sentence the defendant to an extended term. 730 ILCS 5/5—8—2(a) (West 2000). This amendment became effective February 23, 2001, almost two months prior to defendant's trial in April 2001.[1] Section 111—3 of the Code of Criminal Procedure of 1963, regarding the required form of criminal charges, was also amended at the same time. Pub. Act 91—953, § 5, eff. February 23, 2001 (amending 725 ILCS 5/111—3 (West 1998)). That change now requires the State to provide written notice whenever a fact, other than a prior conviction, that is not an element of the offense will be used to seek an increased range of penalties.

■ An *ex post facto* law is one that is retrospective, affects substantial rights, and disadvantages the defendant. *Miller v. Florida*, 482 U.S. 423, 430, 96 L. Ed. 2d 351, 360, 107 S. Ct. 2446, 2451 (1987). A defendant does not, however, have a "vested right" in the modes of procedure used at his trial. *Miller*, 482 U.S. at 430, 96 L. Ed. 2d at 360, 107 S. Ct. at 2451; *Dobbert v. Florida*, 432 U.S. 282, 293, 53 L. Ed. 2d 344, 356, 97 S. Ct. 2290, 2298 (1977); *People v. Felella*, 131 Ill. 2d 525, 536, 546 N.E.2d 492, 497 (1989). The *ex post facto* clause does not limit the legislature's control of remedies or modes of procedure, so long as they do not affect matters of substance. *Beazell v. Ohio*, 269 U.S. 167, 70 L. Ed. 216, 46 S. Ct. 68 (1925).

---

[1] The section was amended again, but that amendment was not effective until after defendant's trial. Pub. Act 92—591, eff. June 27, 2002.

■ The amended versions of section 111—3 of the Code of Criminal Procedure of 1963 and section 5—8—2(a) of the Unified Code (730 ILCS 5/5—8—2(a) (West 2000)) merely affect a mode of procedure. The amendments clearly did not alter legal rules to make convictions easier, nor did they increase the punishment for a previously committed offense or make any changes to the elements of the offense of murder. The only change made is that the finder of fact must determine the existence of the relevant aggravating factors beyond a reasonable doubt, thereby increasing the burden required of the State. The amendments do not violate the *ex post facto* provisions of the United States Constitution (U.S. Const., art. I, § 10) or the Illinois Constitution (Ill. Const. 1970, art. I, § 16). *Felella*, 131 Ill. 2d at 537, 546 N.E.2d at 497.

■ Defendant alternatively argues that this court should reverse because the legislature did not provide for special interrogatories to be given to the jury during the guilt-innocence phase of the trial. Defendant relies specifically on the fact that special interrogatories are not favored in the law. See *People v. Ruppel*, 303 Ill. App. 3d 885, 708 N.E.2d 824 (1999); *People v. Testin*, 260 Ill. App. 3d 224, 632 N.E.2d 645 (1994). Defendant argues that the aggravating factor could have been submitted to a jury in a bifurcated approach wherein the jury would not have been given the special interrogatory until after he had been found guilty of the offense of murder.

Although the legislature did not specifically authorize the use of special interrogatories at the guilt phase, the legislature also did not provide for a bifurcated sentencing proceeding similar to death penalty proceedings. See 720 ILCS 5/9—1(d) (West 2000). Supreme Court Rule 451 specifically gives the trial court authority to use nonpattern instructions when no pattern instructions exist that correctly state the law. 177 Ill. 2d R. 451. The decision whether to give a nonpattern instruction rests within the sound discretion of the circuit court and should not be overturned on review absent an abuse of discretion. *Testin*, 260 Ill. App. 3d at 230, 632 N.E.2d at 649. We find that the trial court judge did not abuse his discretion in submitting the special interrogatory to the jury.

■ Finally, on the use of the special interrogatory, defendant argues that the trial court and the prosecutor usurped the function of the legislative branch of the government. We reject defendant's argument and instead find that the court was simply utilizing the most logical method of complying with *Apprendi* and also acting in accordance with Public Act 91—953 (Pub. Act 91—953, § 10, eff. February 23, 2001 (amending 730 ILCS 5/5—8—2(a) (West 1998))).

The dissent argues that the amendments to Public Act 91—953

"enact an additional element that, if proven beyond a reasonable doubt to a jury, proves the commission of a crime more egregious than murder." 344 Ill. App. 3d at 450. The dissent believes that we are applying an "element" created in 2001 to conduct that had been performed in 2000. This is not the case. By allowing the judge to enhance defendant's sentence based on the brutal and heinous nature of a crime, we are not applying an additional "element" necessary to convict defendant of murder. Rather, the brutal and heinous finding is solely an element of sentencing. As the Illinois Supreme Court recently stated in *People v. De La Paz*, 204 Ill. 2d 426, 791 N.E.2d 489 (2003):

> "*Apprendi* is about sentencing only. For *Apprendi* concerns to come into play, a criminal defendant must already have been found guilty of the underlying crime. A defendant raising an *Apprendi* claim on appeal is simply complaining that he received a sentence in excess of the normal sentencing range, without the fact or facts necessary to permit such sentence having been proven to a jury beyond a reasonable doubt. See *United States v. Sanchez-Cervantes*, 282 F.3d 664, 671 (9th Cir. 2002) (rejecting retroactive application of *Apprendi* because *Apprendi* 'only affects the enhancement of a defendant's sentence once he or she has already been convicted beyond a reasonable doubt. Therefore, it does not rise to the level of importance of' other cases which have been found to apply retroactively). Thus an *Apprendi* violation does not mean that a defendant is imprisoned on 'a charge never made *** and never heard by the jury.' The most that can be said is that an *Apprendi* violation results in a defendant's imprisonment on a charge *one element of which*—the sentencing enhancement—was not proven to a jury beyond a reasonable doubt." (Emphasis in original.) *De La Paz*, 204 Ill. 2d at 436-37, 791 N.E.2d at 495-96.

Similarly, in our case, the use of the special interrogatory asking the jury whether it found that defendant committed the crime by brutal and heinous behavior indicative of wanton cruelty was used only in sentencing defendant to an extended term. It was not used to create an extra element to the underlying offense of murder.

The dissent argues that it is "impossible to reconcile" *De La Paz* with *Apprendi* and cites to Justice Scalia's opinion in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 111, 154 L. Ed. 2d 588, 598-99, 123 S. Ct. 732, 739 (2003). 344 Ill. App. 3d at 451. *Sattazahn* involved the United States Supreme Court's analysis of the double jeopardy clause as it pertains to *Apprendi*. In *Sattazahn*, the jury returned convictions of first-, second-, and third-degree murder and various other charges. In accordance with Pennsylvania law, the proceedings then moved into a penalty phase. The State presented evidence on one statutory aggravating circumstance that would allow the defendant to be sentenced

to death. After it was determined that the jury was hopelessly deadlocked, the trial judge discharged the jury as hung and entered the required life sentence. The Pennsylvania Superior Court concluded that the trial judge had erred in instructing the jury in connection with various offenses with which the defendant was charged, and the court reversed the defendant's first-degree-murder conviction and remanded for a new trial. *Commonwealth v. Sattazahn*, 428 Pa. Super. 413, 631 A.2d 597 (1993).

On remand, the State filed a notice of its intent to seek the death penalty. The State realleged the aggravating circumstance alleged at the first sentencing hearing and also alleged a second aggravating circumstance. The trial court denied the defendant's motion to prevent the State from seeking the death penalty and from adding the second aggravating circumstance on retrial, and the superior court affirmed. *Commonwealth v. Sattazahn*, 451 Pa. Super. 629, 679 A.2d 257 (1996). The Pennsylvania Supreme Court declined to review the ruling. *Commonwealth v. Sattazahn*, 547 Pa. 742, 690 A.2d 1162 (1997). Following a second trial, the jury again convicted the defendant of first-degree murder and, this time, imposed a sentence of death. The Pennsylvania Supreme Court affirmed both the verdict of guilt and the sentence of death on direct appeal, finding that neither the double jeopardy clause nor the due process clause barred the State from seeking the death penalty at the defendant's retrial. *Commonwealth v. Sattazahn*, 563 Pa. 533, 763 A.2d 359 (2000).

The United States Supreme Court analyzed what constitutes an element necessary to impose an *Apprendi* analysis and determined, "If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that 'acquittal' on the offense of 'murder plus aggravating circumstance(s).' " *Sattazahn*, 537 U.S. at 112, 154 L. Ed. 2d at 597, 123 S. Ct. at 740. In *Sattazahn*, the Court concluded that since the defendant's first sentencing jury had not made any findings regarding aggravating or mitigating circumstances, there was no double jeopardy bar to Pennsylvania's retrying the defendant. Thus, the *Sattazahn* Court was only stating that the aggravating factor which was a factor in determining death penalty eligibility—similar to our necessary finding of brutal and heinous behavior in order to impose an extended-term sentence—was to be found after the jury had determined the defendant's guilt and had to be proven beyond a reasonable doubt. The Court was not stating that the aggravating factor created an additional element to the crime but, rather, that it created an element for sentencing that had to be found beyond a reasonable doubt by the jury in order to comply with *Ap-*

*prendi.* Similarly, *De La Paz* stands for the proposition that *Apprendi* concerns relate to sentencing and not the underlying elements of the crime. Therefore, we do not believe that it is impossible to reconcile *De La Paz* and *Apprendi.*

In the case at bar, the jury found that defendant committed the first-degree murder of Renee. Through a special interrogatory, the jury also found the existence of an extended-term sentencing factor—brutal and heinous behavior—beyond a reasonable doubt. The trial judge then used this necessary finding to sentence defendant to an extended-term sentence. It did not create a new "element" of the crime of murder. The trial judge acted in accordance with *Apprendi* and its progeny.

## Fair Trial

### Photographs

Defendant next argues that the court erred in allowing into evidence photographs, based on the gruesomeness, size, and number of the photographs. Although defendant concedes that these photographs may have had probative value, he argues that their value was offset by their prejudicial nature.

■ The decision of whether to allow the jury to view photographs is left to the circuit court's discretion and is reversed only for an abuse of that discretion. *People v. Shum,* 117 Ill. 2d 317, 353, 512 N.E.2d 1183, 1196-97 (1987). If the photographs are relevant to prove facts at issue, they are admissible and may be shown to the jury unless the prejudicial nature of the photographs outweighs their probative value. *People v. Heard,* 187 Ill. 2d 36, 718 N.E.2d 58 (1999). Even gruesome and inflammatory photographs may be admitted if sufficiently probative. See *People v. Driskel,* 224 Ill. App. 3d 304, 314-15, 586 N.E.2d 580, 587 (1991) (more than 50 photographs were allowed because they were probative of the amount of force used and the number of persons who had committed the offense, and in any event, any error was harmless); *People v. Simms,* 143 Ill. 2d 154, 572 N.E.2d 947 (1991) (the admission of photographs of the victim's partially naked body, of stab wounds in the victim's neck, and of bloodstains in the victim's apartment was not an abuse of discretion because they were probative of the defendant's mental state); *Heard,* 187 Ill. 2d 36, 718 N.E.2d 58 (photographs depicting a female victim with her uterus being held open to show the six- to eight-week-old fetus she had been carrying and another victim who had been shot 17 times were allowed); *People v. Armstrong,* 183 Ill. 2d 130, 700 N.E.2d 960 (1998) (photographs that showed the shattered pieces of the victim's skull were properly admitted to the jury); *People v. Anderson,* 237 Ill. App. 3d 621, 604 N.E.2d

546 (1992) (the trial court did not err in allowing crime scene and autopsy photos to be submitted to the jury).

■ In this case, the photographs were relevant and admissible. These photographs were relevant to establish the nature and extent of Renee's injuries and the manner in which the injuries had been inflicted, to corroborate the testimony of the officers and crime scene technicians who had found Renee and described the crime scene, and to help the jurors understand the testimony of the pathologist who had performed the autopsy. The photographs of Renee's body as it had been discovered at the scene of the crime were probative of the method of force of defendant's attack. They informed the jury of the extent and nature of Renee's injuries much more accurately than the testimony of the witnesses who had viewed the murder scene. Additionally, despite some gruesome aspects of the photographs, they were relevant to prove defendant's eligibility for an extended term under section 5—5—3.2(b) of the Unified Code, based on the brutal and heinous manner in which defendant committed Renee's murder.

Defendant argues that *People v. Garlick*, 46 Ill. App. 3d 216, 360 N.E.2d 1121 (1977), is on point. In *Garlick*, the defendant alleged error in the admission of a single "gruesome, color photograph of the deceased's massive head wound" that went to the jury. *Garlick*, 46 Ill. App. 3d at 224, 360 N.E.2d at 1126-27. The appellate court found that the photographs served no purpose other than to inflame and prejudice the jury. *Garlick* is easily distinguishable from the case at bar. In *Garlick*, the defendant admitted guilt and was only arguing insanity. Therefore, those pictures were not showing the force that had been used or the manner in which the murder had been committed. Unlike *Garlick*, at issue in this case is defendant's guilt and the manner in which he performed his acts. Therefore, we find *Garlick* inapposite and hold that the trial judge did not abuse his discretion in admitting the photographs.

### Hearsay

Defendant next argues that the court erred when it overruled defendant's objections to hearsay statements from witnesses Jason Kitner and Shannon Weger, who testified regarding Renee's fear of defendant.

Jason Kitner testified to the following:

"Q. [State's Attorney:] During that period of time that you knew her, from spring of '96 through June the 9th of 2000, do you know of anyone who threatened her?

A. [Jason:] Yes.

Q. Who was that person?

[Defense Counsel:] I'm going to object, your Honor. I believe this witness's knowledge is based on hearsay.

THE COURT: The objection is overruled.

Q. [State's Attorney:] Who was that person?

A. It was Donnie.

Q. The defendant?

A. Yes."

■ Evidence of prior threats of an accused to do violence to the person eventually slain is admissible to show malice and criminal intent. *People v. Jayne*, 52 Ill. App. 3d 990, 1007, 368 N.E.2d 422, 434 (1977); *People v. Wood*, 72 Ill. App. 3d 919, 391 N.E.2d 206 (1979). However, in the case at bar, the court erred in failing to grant defendant's objection and should have required the prosecution to lay a proper foundation before engaging in this line of questioning. During cross-examination, Jason testified that he had never met defendant and that the source of his knowledge regarding the threat was from Renee. If the court had required the prosecution to lay a foundation, it would have demonstrated that his testimony was not based on his personal knowledge of defendant's statement but was based on hearsay that he had learned from the victim. Nevertheless, not every erroneous admission of evidence requires a reversal. *People v. Rozo*, 303 Ill. App. 3d 787, 790, 708 N.E.2d 1229, 1232 (1999). Rather, a new trial is warranted only where the evidence improperly admitted was so inflammatory that it deprived the defendant of a fair trial or where the improper evidence appears to have affected the outcome of the trial. *People v. Swanson*, 335 Ill. App. 3d 117, 126, 780 N.E.2d 342, 350 (2002). In this case, the introduction of Jason's hearsay statement does not warrant a new trial. The evidence of defendant's guilt was overwhelming.

Regarding defendant's argument regarding the testimony of Shannon Weger, the record reflects that the following colloquy took place during the direct examination of Shannon:

"Q. [State's Attorney:] Now, in the two[—]almost two years that you knew Renee, did you know her to have any enemies?

A. [Shannon:] To my knowledge, the only person that she felt threatened by was Donnie Forcum.

[Defense Counsel:] Objection, your Honor. It calls for speculation and based on hearsay.

THE COURT: Sustained. And the answer will be stricken.

Q. [State's Attorney:] Did everyone you encountered [*sic*] appear to have liked Renee?

A. Yes, very much.

Q. Do you know firsthand of anyone who may have wanted to do her harm?

A. No. Again, just what I said before."

On cross-examination the following colloquy occurred:

"Q. [Defense Counsel:] You met Donald Forcum one time?

A. [Shannon:] Right.

Q. So you observed Renee and Donald together one time?

A. Right.

Q. And based on that observation, you decided they have had a tumultuous relationship?

A. That observation is based on how Renee behaved at work for the rest of the spring of 2000 and other things that she said directly to me.

[Defense Counsel:] Hearsay?

[THE COURT:] (Affirmative nod.)

[Defense Counsel:] You had no personal knowledge based on what you saw or heard about their relationship?

A. I did not observe them together.

[Defense Counsel:] Thank you. Your honor, I would ask that her answer be stricken with regard to the information—her testimony about the—it being [a] tumultuous relationship and all reference whatsoever to the hearsay matter she testified with regard to.

THE COURT: I'll allow it to stay in the record, and the people can consider it for whatever weight it is worth."

Based on a reading of Shannon's testimony, it is apparent that the trial court sustained defendant's objection and struck Shannon's testimony concerning Renee feeling threatened by defendant. The only objection the trial court overruled concerned Shannon's testimony that Renee's relationship with defendant was "tumultuous." The testimony concerning the tumultuous nature of the relationship is not the same as the testimony concerning Renee's fear of defendant. Additionally, during direct examination, defendant did not object to the fact that the relationship had been referred to as "tumultuous," which supports the view that the trial court was within its discretion to overrule defendant's objection to the same testimony brought out during cross-examination. Additionally, where there is no reasonable possibility that a jury would have acquitted the defendant if the hearsay evidence had been excluded, admission of the evidence is harmless error. *People v. Griggs*, 104 Ill. App. 3d 527, 531, 432 N.E.2d 1176, 1179 (1982); *People v. Hall*, 90 Ill. App. 3d 1073, 1077, 414 N.E.2d 201, 204 (1980). Therefore, even if defendant had succeeded with his argument that the statements were hearsay, which we do not find, any error would be harmless based on the overwhelming evidence against defendant. Therefore, we find this argument has no merit.

## *Letter/Taped Message*

Defendant next argues that the court erred in allowing the prosecutor to replay during closing argument threatening messages

that defendant had left on Brett's answering machine and to read portions of the 22-page letter that defendant had given to Renee a few days prior to her murder. Defendant argues that the replaying of the message and the reading of the letter placed undue emphasis on these pieces of evidence.

A trial court's decision to allow counsel to read from the record during closing argument will not be disturbed absent an abuse of discretion. *People v. Pierce*, 56 Ill. 2d 361, 364, 308 N.E.2d 577, 578 (1974); *People v. Davies*, 50 Ill. App. 3d 506, 513, 365 N.E.2d 628, 634 (1977). Additionally, properly admitted evidence may be displayed during closing argument. *People v. Eckles*, 83 Ill. App. 3d 292, 301, 404 N.E.2d 358, 365 (1980).

We find no error in the court allowing the prosecutor to play the tape and read a portion of the letter. The tape recording and the letter had been admitted into evidence, and the jurors had the opportunity to examine the letter themselves. The prosecutor's reading of the letter was accurate and constituted only a small portion of the State's closing argument.

Defendant's reliance on *People v. Ammons*, 251 Ill. App. 3d 345, 622 N.E.2d 58 (1993), is misplaced. In *Ammons*, the court reversed a conviction where the State replayed an 18-minute audiotaped statement in its entirety during closing argument. *Ammons*, 251 Ill. App. 3d at 347, 622 N.E.2d at 59. The court found that the taped statement was substantially similar to the defendant's testimony, so that replaying it in its entirety placed undue emphasis on its contents. *Ammons*, 251 Ill. App. 3d at 347, 622 N.E.2d at 60. The court also determined that permitting the taped statement to be played during the State's rebuttal closing argument "dramatically overemphasized its credibility" and that the error could not be deemed harmless because the evidence of the defendant's guilt was not overwhelming. *Ammons*, 251 Ill. App. 3d at 347-48, 622 N.E.2d at 60.

Unlike the recorded statement in *Ammons*, which involved the reading of testimony already heard, in the present case, the prosecutor merely directed the attention of the jurors to an exhibit that they had available for examination during deliberations. Additionally, the evidence of defendant's guilt was overwhelming. Thus, we hold that the trial court did not abuse its discretion in allowing the playing of the tape recording and the reading of the letter.

### *Vacation of Sentence*

■ Defendant's remaining argument is that his convictions for home invasion and armed violence should be vacated because they violate the one-act, one-crime rule based on *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977). In *King*, the Illinois Supreme Court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser[-]included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser[-]included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45.

The rule in *King* was later refined by the Illinois Supreme Court in *People v. Rodriguez*, 169 Ill. 2d 183, 661 N.E.2d 305 (1996). In *Rodriguez*, the court, in discussing the definition of "act," held that it simply means " 'any overt or outward manifestation which will support a different offense.' " *Rodriguez*, 169 Ill. 2d at 186, 661 N.E.2d at 306, quoting *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45. The court went on to state that a person can be guilty of two offenses when a common act is a part of both offenses. *Rodriguez*, 169 Ill. 2d at 188, 661 N.E.2d at 308. Specifically, *Rodriguez* held that convictions for both aggravated criminal sexual assault and home invasion are proper where the defendant committed multiple acts, despite the interrelationship of those acts.

In the case at bar, the charging instruments show that the murder counts for the death of Renee (counts I, II, and III) and the home invasion count (count V) were based upon the same act—the repeated stabbings of Renee. Similarly, the attempted murder (count IV) and armed violence (count VI) counts were both based upon the repeated stabbings of Brett.

The State concedes that the armed violence count based on the stabbings of Brett should be vacated based on *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), wherein the Illinois Supreme Court recently held that the defendant's conduct of stabbing a victim three times constituted only a single act and did not support multiple convictions. The court stated that, although the conduct could have supported two separate convictions, one for aggravated battery and another for armed violence, the State did not differentiate between the stab wounds and did not apportion them to separate offenses either in the charging instrument or to the jury at the trial. *Crespo*, 203 Ill. 2d at 342-45, 788 N.E.2d at 1121-22. Therefore, the State was

precluded from treating the defendant's conduct as multiple acts supporting multiple convictions. *Crespo*, 203 Ill. 2d at 345, 788 N.E.2d at 1123.

We hold that defendant's conviction for home invasion does not violate the one-act, one-crime rule for the reasons stated in *Rodriguez*, and we therefore affirm his conviction for home invasion. We vacate defendant's conviction for armed violence for the reasons set forth in *Crespo*.

## CONCLUSION

For the aforementioned reasons, we vacate defendant's conviction for armed violence but otherwise affirm the judgment of the circuit court of Jackson County.

Affirmed in part and vacated in part.

CHAPMAN, J., concurs.

JUSTICE KUEHN, dissenting:

I dissented in *People v. O'Quinn*, registering my disagreement with the majority opinion that the amendments to the criminal code which are at issue here could be applied to an offense committed before their enactment. *People v. O'Quinn*, 339 Ill. App. 3d 347, 791 N.E.2d 1066 (2003). Because my chief concern was over the lack of speed at which Mr. O'Quinn was prosecuted, I did not fully address why I felt that using the amendments to prosecute the crime of infant murder violated the constitutions' prohibition of *ex post facto* laws. Therefore, I respectfully depart again, to fully explain my view. Hereafter, I will abide by the law crafted by my colleagues.

This case involves a long-standing fundamental principle.

Our forefathers, being somewhat concerned about abuses of governmental power, assured themselves that lawmakers could never criminalize and punish conduct with a bill that outlawed it after the fact. They placed a constitutional constraint upon the use of legislation to penalize someone for behavior that was not illegal at the time that it was committed. Our constitutions guard against *ex post facto* laws and reserve the pains of punishment for those who engage in conduct that society has clearly prohibited in advance. It is deep-rooted that, in America, people are only prosecuted for breaking laws that are already in existence, not for *ex post facto* bans on some activity.

This case examines whether legislation that empowered Illinois juries to determine the brutality of a particular offense and, based on

that determination, subject an offender to greater punishment runs counter to this fundamental constitutional protection.

The majority's resolution of this question finds reason in the following passage of the opinion:

> "The amended versions of section 111—3 of the Code of Criminal Procedure of 1963 and section 5—8—2(a) of the Unified Code [citation] merely affect a mode of procedure. The amendments clearly did not alter legal rules to make convictions easier, nor did they increase the punishment for a previously committed offense or make any changes to the elements of the offense of murder. The only change made is that the finder of fact must determine the existence of the relevant aggravating factors beyond a reasonable doubt, thereby increasing the burden required of the State." 344 Ill. App. 3d at 439.

I take issue with this position.

When Mr. Forcum killed Renee DiCicco, the most severe crime that could be charged and submitted to a jury for its determination was a crime composed of three basic elements. The State was authorized to allege and prove beyond a reasonable doubt that:

> 1. Mr. Forcum caused Renee DiCicco's untimely death,
> 2. without legal justification, and
> 3. with the intent to kill.

However, because of changes in the law, made after Mr. Forcum's extremely brutal behavior, jurors were permitted to determine an added fact that constituted an element of a greater offense and that carried a greater penalty than the offense defined by the three elements of murder. The law's amendment allowed the State to seek a jury determination that:

> 1. Mr. Forcum caused Renee DiCicco's untimely death,
> 2. without legal justification, and
> 3. with the intent to kill, and
> 4. Renee DiCicco's death was accompanied by brutal and heinous behavior indicative of wanton cruelty.

Contrary to the majority's view, this change in what a jury could determine about Mr. Forcum's guilt was not procedural. There simply cannot be any more substantive a change in the law than a change to the list of matters that a jury must decide to determine the extent of a person's guilt. The jury trial guarantee promises that a jury must test every accusation made against an accused. *United States v. Gaudin*, 515 U.S. 506, 510, 132 L. Ed. 2d 444, 450, 115 S. Ct. 2310, 2313 (1995). Here, the list of accusations to be decided was changed after the criminal conduct had already occurred. The very substance of what this defendant could be charged and prosecuted with changed. And the defendant's exposure to punishment changed as well.

In truth, the statutory amendments did not change anything about the procedure for arriving at a proper punishment. Both before and after the statutory changes, procedure called for the jury to first determine a list of factual issues and reach a verdict of guilt or innocence on the State's charges. After the jury's finding of guilt, the sentencing judge needed to consider a list of aggravating and mitigating circumstances in order to arrive at a just sentence. This was the procedure before the statutory amendments. It remains the procedure after them. The only change wrought by the amendments was a jury's measure of someone's guilt, a change in the substance of what a jury could find to be a killer's criminal behavior. The amendments changed the jury's list of factual issues—they changed the potential scope of guilt. However, the procedure for arriving at a just sentence did not change.

The majority's suggestion that the only change in the law benefited Mr. Forcum, by increasing the State's burden, is misplaced. The harm done by the statutory amendments is manifest. Mr. Forcum had to defend against an additional element of criminality, an element that enhanced his penalties, an element that could not have been tried before a jury and, therefore, could not have enhanced punishment, at the time that Mr. Forcum took a human life. No one could be constitutionally punished with an enhanced sentence at the time that this murder was committed. *People v. Swift*, 202 Ill. 2d 378, 379, 781 N.E.2d 292, 292 (2002).

While it is true that the amendments do not change the elements of the crime of murder, as that crime was defined at the time of this offense, the amendments do enact an additional element that, if proven beyond a reasonable doubt to a jury, proves the commission of a crime more egregious than murder. Accordingly, the amendments allow the State to establish guilt for additional conduct that warrants greater punishment than murder. It is difficult for me to view such a change as a simple matter of procedure rather than an enactment of a substantive change to the criminal code. In effect, the amendments empower the State to prove the commission of more evil conduct than the conduct necessary to commit murder and to punish those who commit it more severely. Such legislative authority having been given after the fact would seem to offend the protection provided by the *ex post facto* prohibition against outlawing and prosecuting conduct after the fact.

The majority views the brutal and heinous finding as "solely an element of sentencing." 344 Ill. App. 3d at 440. This misapprehends the difference between crime and punishment. The jury finding authorized by the legislative changes, a finding that exposed this

defendant to a greater penalty, is not about sentencing or punishment. It is about the conduct committed. It is about crime—not punishment.

The majority thinks it finds support for its view in language from a recent Illinois Supreme Court opinion. *People v. De La Paz*, 204 Ill. 2d 426, 435-37, 791 N.E.2d 489, 495-96 (2003). It points to language in *De La Paz* that says:

> "*Apprendi* is about sentencing only. For *Apprendi* concerns to come into play, a criminal defendant must already have been found guilty of the underlying crime. \*\*\* The most that can be said is that an *Apprendi* violation results in a defendant's imprisonment on a charge *one element of which*—the sentencing enhancement—was not proven to a jury beyond a reasonable doubt." *De La Paz*, 204 Ill. 2d at 436-37, 791 N.E.2d at 495-96.

I cannot take this to mean what the majority thinks it means. Indeed, outside the realm of *Apprendi*, and a determination of its prospective application, our high court would never countenance a person's imprisonment when the State had failed to prove an element of the crime charged. However, if my colleagues are correct, it is impossible to reconcile this passage with what the people who wrote *Apprendi v. New Jersey* have to say about it.

Justice Scalia recently noted:

> "Our decision in *Apprendi v. New Jersey* [citation] clarified what constitutes an 'element' of an offense for purposes of the Sixth Amendment's jury-trial guarantee. Put simply, if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact—*no matter how the State labels it*—*constitutes an element*[ ] *and must be found by a jury beyond a reasonable doubt.* [Citation.]
>
> Just last Term we recognized the import of *Apprendi* in the context of capital-sentencing proceedings. In *Ring v. Arizona* [citation], we held that aggravating circumstances that make a defendant eligible for the death penalty 'operate as "the functional equivalent of an element of a greater offense." ' [Citation.] That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of 'murder' is a distinct, lesser[-]included offense of 'murder plus one or more aggravating circumstances' \*\*\*." (First emphasis added; later emphasis omitted.) *Sattazahn v. Pennsylvania*, 537 U.S. 101, 111, 154 L. Ed. 2d 588, 598-99, 123 S. Ct. 732, 739 (2003).

This defendant was properly convicted of the "distinct, lesser[-]included offense" of first-degree murder. He was not properly convicted of the "greater offense" of brutal and heinous murder indicative of wanton cruelty because that offense did not exist until it was created by our legislature in February of 2001 by the passage of

452

Public Act 91—953. Pub. Act 91—953, § 10, eff. February 23, 2001. Applying an element created in February of 2001 to conduct performed in 2000 violates the constitutions' prohibition of *ex post facto* laws.

For these reasons, I respectfully dissent.