**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 180232-U

Order filed March 29, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0232 Circuit No. 17-CF-216 |
| | ) | |
| JEREMIAH L. HILLSMAN, | ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON[1] delivered the judgment of the court.
Presiding Justice Holdridge and Justice Hettel concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   The defendant was not denied a fair trial and counsel did not provide ineffective assistance. The court conducted a sufficient preliminary *Krankel* inquiry.

¶ 2      Defendant, Jeremiah L. Hillsman, appeals his conviction for aggravated battery.

Defendant argues that the State denied him a fair trial by introducing a substantial amount of

overly prejudicial evidence. Further, that his counsel's failure to prevent and preserve that error

_____

[1]This case was administratively reassigned to Justice Peterson for authorship on December 19, 2022, however, Justice Peterson has listened to the recording of the oral argument.

amounted to ineffective assistance. Additionally, defendant argues that the Peoria County circuit court failed to conduct an adequate preliminary inquiry, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into his posttrial claim of ineffective assistance of counsel. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        The State charged defendant with aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2016)). A public defender was appointed to represent defendant. The matter proceeded to a jury trial.

¶ 5        On the day the jury trial was set to begin, defense counsel filed a request, signed by defendant, for a six-person jury. The document also waived defendant's right to a 12-person jury. The court addressed the request directly with defendant. The court asked twice if defendant wanted a six-person jury and both times defendant responded affirmatively. It also asked if anybody threatened defendant to give up his right to a 12-person jury and defendant responded, "No, sir." The court confirmed defendant was not under the influence of drugs or alcohol. It also admonished defendant that if he waived his right to a 12-person jury, the waiver was irrevocable. The court then asked what defendant wanted and defendant replied, "I'd like six."

¶ 6        The evidence at trial established that the victim, C.R., was approximately 14 months old at the time of the offense and defendant was over 18 years of age. When C.R.'s mother, Danielle Rodier, left her house with C.R. late in the evening of November 17, 2016, C.R. was generally healthy and unharmed. Rodier brought C.R. to defendant's apartment and spent the night. She had known defendant for about two months. Rodier brought C.R. to the emergency room the morning of November 18. Expert testimony provided that C.R. sustained multiple, non-accidental, traumatic injuries. The various injuries could have been caused by "direct blow[s]," squeezing, grabbing, compression, choking, strangulation, shaking, or shaking with impact. The

2

injuries were consistent with having been received in the late evening hours of November 17. C.R. sustained a brain injury and would not have eaten normally afterwards.

¶ 7        The State introduced into evidence video recordings of two police interviews with defendant. During one interview, detective Cody Wilson stated that defendant lied. The State called Wilson as a witness. He read into evidence various Facebook messages between defendant and Barbara Boolman that were sent between 10:03 and 11:57 a.m. on November 18, 2016. Defendant initiated the exchange by asking Boolman what she was doing. At approximately 10:45 defendant told Boolman he was "in need of some good relaxation," and asked Boolman to come to his place. Boolman stated she would not be able to stay long and defendant responded, "I just want some of you." The last message from defendant in that exchange was "never mind," and was sent at 11:57. Wilson also testified that he spoke with defendant regarding Facebook messages that he sent Rodier on November 19, 2016, and defendant stated that he sent messages to her inquiring about C.R.'s welfare.

¶ 8        Officer Adam Ragon testified that on November 18, 2016, he was sent to defendant's apartment to contact him. He received the call at 11:54 a.m. and arrived at defendant's apartment approximately two minutes later. Ragon knocked on the door and did not receive a response until about 15 minutes later. Defendant told Ragon the reason it took him so long to answer the door was because he was sleeping. Defendant did not have an obligation to answer the door.

¶ 9        Chontoya Johnson testified that she has a son, J.H., with defendant. J.H. was enrolled at the Peirson Hills Headstart Center (Headstart) in November 2016. On November 18, 2016, defendant picked J.H. up from Johnson about 9 a.m. and returned him about 11:00 a.m. Johnson did not have a car at that time.

3

¶ 10 Latonya Reed testified that she was the site director at Headstart in November 2016. J.H. was enrolled there at that time. November 18, 2016, was a half day. On the half days, teachers would complete paperwork in the morning and participate in professional development in the afternoon. On November 18, Reed did not call J.H.'s parents for a conference, J.H. was not in attendance, and Reed did not see either of J.H.'s parents. Reed did not have any conferences that day.

¶ 11 Matthew O'Marah testified that he was an investigator for the Department of Children and Family Services (DCFS). He was assigned to investigate injuries to C.R. DCFS implemented a safety plan as to J.H, whereby defendant was to have no contact with J.H. until the DCFS and police investigations were concluded. The safety plan ended in January 2017. On cross-examination, O'Marah was asked by defense counsel what the outcome of his investigation was and he responded that defendant "was indicated for the report." Counsel followed up by asking if that was with respect to J.H. and he replied that it was with respect to C.R. On redirect, the State asked O'Marah to clarify what he meant when he said defendant was indicated. Defense counsel objected but the court held the objection was overruled. O'Marah clarified that "indicated" meant "[j]ust that there is enough proof to say that the event did happen."

¶ 12 Rodier testified that on November 17, she and C.R. arrived at defendant's apartment at approximately 11 p.m. When she got C.R. out of his car seat, he was a little fussy and tired. When they went into defendant's apartment, she took C.R. to defendant's bedroom to put him to bed. She was not successful so she took C.R. into the living room. Defendant offered to put C.R. to bed. Defendant was alone in the bedroom with C.R. for about 20 minutes. C.R. was initially fussy but then "got really really loud." C.R. "was crying a lot. Screaming. And he would have like almost like a choking noise. It would go, it would get quiet for a little bit. Then he would

4

start having a choking noise again and crying." Rodier heard "like a slapping noise. A few of them." The cries she heard from C.R. coming from the bedroom were some "of the worst cries" she heard from him, and he sounded very stressed and agitated. After hearing the slapping noise, she went into the room. Rodier did not go in earlier because she thought the other noises were from C.R. crying hard and that when he was quiet, he had just calmed down. When she entered the room, she saw blood on defendant's shirt and C.R.'s face. Defendant told her C.R. was throwing himself around and there was blood because a scab on C.R.'s face had opened. Rodier decided to put C.R. to bed herself. She attempted to breastfeed C.R. He calmed down after 15-20 minutes. C.R. fell asleep but was restless. Rodier eventually slept in the bed with C.R. As to where C.R. would have been in relation to Rodier, she stated "[h]e would have gone back and forth on both sides of me with breastfeeding."

¶ 13    At 8:00 the next morning Rodier attempted to wake C.R. but he did not respond normally. She could tell something was wrong immediately. Rodier decided to take C.R. to the emergency room and defendant helped her to her vehicle. Defendant told Rodier he was going to go with her but he did not because he said he received a phone call regarding a conference at Headstart and had to go immediately. Defendant said he would meet Rodier at the hospital but did not.

¶ 14    Rodier and defendant exchanged various phone calls and text messages while she was at the hospital. The State had Rodier go through each of the calls stating what time the call was made, who made the call, and whether it was answered. Rodier answered a phone call from defendant at 8:06 a.m. She then missed 11 calls from him between 8:13 and 8:29. She answered five calls from defendant between 8:38 and 9:36. Rodier then missed calls from defendant at 10:32 a.m., 12 p.m., and 12:01 p.m. She answered a call from defendant at 12:02 and he asked

5

her why the police were at his apartment. Defendant seemed nervous and did not ask about C.R. Rodier called defendant at 12:29 but he did not answer. The rest of the calls during which they spoke, she was giving defendant updates and asking him to come to the hospital. Defendant was telling her he could not make it, initially because of the conference at his son's Headstart program, but then because his car broke down. The State also had Rodier read the text messages she and defendant exchanged. Rodier was updating defendant on C.R.'s condition and asking him to come to the hospital. At one point, defendant stated that Johnson had picked up J.H. Defendant told Rodier that he was waiting for a ride and the ride was on the way. He further indicated that he was worried about coming to the hospital because he thought there may be issues with her family suspecting him. Defendant also reached out to Rodier on Facebook the next day. Rodier read those messages in court. Defendant told her he was sorry and expressed worry over J.H. being taken from him.

¶ 15        On cross-examination, Rodier admitted that in a prior proceeding under oath she stated that the sound C.R. was making was more like coughing than choking. She indicated the discrepancy was due to her being nervous at the prior proceeding because the DCFS worker had taken her words out of context before. Her current testimony was accurate. She later clarified on redirect that it sounded like he was coughing so hard he was choking on his spit.

¶ 16        After the State rested, the defense called Marcella Lewis. She testified that she was defendant's neighbor. On November 18, 2016, she saw defendant running with C.R. to Rodier's vehicle. Rodier "was just kind of poking along." Rodier, defendant and C.R. entered the van and left.

¶ 17        Defendant testified that when Rodier and C.R. arrived at his apartment on the 17th, C.R. was cranky. Rodier took C.R. straight into the bedroom. She was in the bedroom for

approximately 15-20 minutes and then she came out alone. Defendant was under the impression C.R. was asleep. At some point C.R. woke up and defendant heard C.R. crying. Defendant offered to put him to sleep. He went into the bedroom, picked up C.R. and tried to comfort him. Defendant did not get C.R. to sleep. About 15 minutes later Rodier came into the room. C.R. was very fussy and crying before Rodier came in. Rodier asked if C.R. was okay. Defendant said he was just not going to sleep. Rodier then attempted to get C.R. to sleep and defendant left the room. Rodier was in the room for another 30-40 minutes. C.R. was still fussy and Rodier went back into the bedroom several times. Eventually Rodier slept in the room with C.R. At about 7:30 or 7:45 a.m., C.R. started crying and defendant took him out to the living room while Rodier stayed in the bedroom. C.R. was agitated and fussy. Defendant initially cradled him but then sat him on the floor. C.R. was sitting up on his own on the floor. After approximately 10 minutes, defendant took C.R. back to the bedroom.

¶ 18        Shortly after, Rodier woke up and realized something was wrong with C.R. She stated they needed to take him to the emergency room. Defendant helped get C.R. to Rodier's vehicle, but before they left, he received a call from Ms. Rita with Headstart informing him of a parent/child conference. He told Rodier he was going to take his son to the conference and then come to the hospital. Defendant wanted to go to the hospital but he did not go, despite telling Rodier several times he was on his way. Defendant did not want to make a bad impression with Rodier's parents, as that would be the first time he would meet them. Defendant also had trouble with his vehicle. Defendant had concerns that the police wanted to talk to him because he was a young black man and did not feel he would be treated fairly by the police. After failing to obtain a ride to the hospital, defendant laid in his bed and fell asleep while he was texting Rodier and others. He was woken up by knocking at his door. When he realized it was the police, he called

7

Rodier to ask why they were there and then opened the door. Defendant testified he did not harm C.R. Defendant did not notice any injuries on C.R. on the 17th or 18th other than a scab on his nose, which had been there previously.

¶ 19        On cross-examination, the State inquired about the problems with defendant's car. He explained that no one fixed his car. He was able to go short distances in it, but the hospital was too far. The State questioned him about the call regarding a conference at Headstart and why defendant thought that was more important than accompanying C.R. to the hospital. Defendant's testimony was inconsistent regarding the term "conference." He also stated that when he arrived at Headstart, there were no vehicles around and he sat in the parking lot and waited. He did not go inside because he did not see anyone outside. Defendant waited for 30 minutes and then started to take J.H. to Johnson. His car overheated on the way. After pulling off the road and waiting for a while he took J.H. to Johnson and then went home.

¶ 20        During closing argument, the State argued that Rodier's testimony regarding the noises she heard while defendant was alone with C.R. are corroborated by the injuries C.R. sustained and the expert testimony regarding how those injuries could have occurred. The State highlighted that as soon as Rodier realized something was wrong with C.R. in the morning, she immediately took him to the hospital. It then focused on defendant's statements that were contrary to other evidence presented, his inconsistencies, and his failure to go to the hospital. Defense counsel focused on the fact that Rodier was alone with C.R. and had the same opportunity to injure C.R. as defendant. In rebuttal, the State referenced defense counsel's argument wherein he questioned what the difference was between Rodier and defendant because they were both in the apartment and had alone time with C.R. It then stated, over objection, that the difference was that Rodier was committed to C.R. and defendant had no commitment to Rodier or C.R. The State further

8

argued that defendant did not want to go to the hospital because he knew C.R. was not just sick but had been beaten.

¶ 21 The court instructed the jury that "[y]ou are to apply the law to the facts and in this way decide the case." Additionally, that "[o]nly you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them." The jury found defendant guilty.

¶ 22 Defendant filed several *pro se* motions, some of which contained allegations of ineffective assistance of counsel. Counsel filed a motion for new trial. At a hearing, the court first addressed defendant's ineffective assistance allegations. The court asked defendant to explain his allegation that "Defendant was mentally manipulated and forced to take a six-panel jury?" Defendant responded that he was advised that a six-person jury would be better because of the severity of the case. He complained that he did not receive any paperwork regarding a six-person jury. Defendant stated, "Now me trusting in him, I took his word for it, and I took the six-person panel jury." Defendant continued "I felt like I was pressured *** into taking a six-person jury *** I've never been in trouble before, so I was going to trust his word regardless." Defendant reiterated that counsel advised him to take a six-person jury. Defendant trusted his counsel and signed the request for a six-person jury and waiver of a twelve-person jury. The court noted that defendant's claim fell under the category of trial strategy. It also indicated there was no prejudice from a six-person jury. The court ultimately determined that the ineffective assistance claims lacked merit and pertained to trial strategy. It also denied counsel's motion for new trial.

¶ 23 The matter proceeded to sentencing and the court sentenced defendant to 24 years' imprisonment. Defendant appeals.

¶ 24                                        II. ANALYSIS

¶ 25                                        A. Fair Trial

¶ 26        Defendant argues that the State admitted a substantial amount of evidence that was only mildly probative and highly prejudicial. Specifically, defendant argues that the State should not have presented extensive evidence of collateral matters, including evidence regarding: (1) his messages with Boolman, (2) his failure to immediately answer the door for police, (3) the conference or lack thereof at Headstart, (4) the DCFS investigation, (5) O'Marah's finding that he was indicated for the report about C.R. and what "indicated" meant, (6) him prioritizing J.H., and (8) Wilson's characterization of him as a liar. Defendant argues this evidence allowed the jury to decide the case on an emotional basis which deprived him of a fair trial. Essentially, defendant's argument is that all of this evidence together was unfairly prejudicial. Defendant further argues that counsel provided ineffective assistance because he failed to attempt to limit the evidence to relevant evidence that was not overly prejudicial and failed to preserve the issue.

¶ 27        Initially, we note that although defendant characterizes this issue as the denial of a fair trial, the issues he raises are evidentiary in nature and are generally analyzed as such because the cumulative effect of properly admitted evidence cannot be said to deprive an individual of a fair trial. Further, because defendant acknowledges the issues were not preserved and has alleged ineffective assistance of counsel in this regard, we address the merits in that context. "To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice." *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *Id.* at 188. "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

10

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Horton*, 143 Ill. 2d 11, 23 (1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 28 Turning to the merits of the evidentiary claims, "[e]videntiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion." *People v. Boclair*, 129 Ill. 2d 458, 476 (1989). An abuse of discretion exists when the court's decision is arbitrary, fanciful or unreasonable or when no reasonable person would take the position of the circuit court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). Generally, relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *** or needless presentation of cumulative evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011). "The question is not whether relevant evidence is more prejudicial than probative; instead, relevant evidence is inadmissible only if the prejudicial effect of admitting that evidence *substantially outweighs* any probative value." (Emphasis in original.) *People v. Pelo*, 404 Ill. App. 3d 839, 867 (2010). The prejudicial effect "means that the evidence in question will somehow cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." *Id.*

¶ 29 In this matter, the State needed to prove that defendant knowingly caused the injuries to C.R. See 720 ILCS 5/12-3.05(b)(1) (West 2016). The evidence generally indicated that, based on the timeline of when the injuries occurred and who was present, either Rodier or defendant caused the injuries. "A conviction can be sustained upon circumstantial evidence as well as upon

11

direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it." *People v. Williams*, 40 Ill. 2d 522, 526 (1968). "Statements or conduct indicating the defendant's consciousness of guilt may serve as circumstantial evidence supporting a conviction." *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 35.

¶ 30        Defendant admits that the evidence he complains of was relevant to the issue of consciousness of guilt. As stated, consciousness of guilt may serve as circumstantial evidence and a conviction may rest on circumstantial evidence. Therefore, the only real question at issue, is whether the relevance of the evidence was substantially outweighed by its prejudicial effect. We cannot say that it was. Specifically, the evidence was generally not of an inflammatory nature and none of the evidence cast defendant in a negative light "for reasons that have nothing to do with the case on trial." *Pelo*, 404 Ill. App. 3d at 867. The inconsistencies and/or lies that were brought to light were not unrelated to the case but rather related to defendant avoiding accompanying Rodier and C.R. to the hospital and answering the door for the police. The evidence of defendant's behavior and untruthfulness in those regards is indicative of consciousness of guilt and not unfairly prejudicial. Defendant argues that his "overtly sexual" messages to Boolman were unnecessary because the State presented other evidence that defendant was not sleeping when police knocked on his door. However, those messages expose defendant in two regards. First, that he was not sleeping when the police knocked on his door, which admittedly was partially established by his phone call to Rodier, but also that he was not attempting to find transportation to the hospital because he was, instead, seeking to have Boolman come to his residence. The messages showed a lack of concern and lack of intent to go to the hospital, despite defendant's repeated assurances to Rodier that he was trying to. As all of

12

this evidence was properly admitted, counsel's performance in failing to object to it was not deficient.

¶ 31    Defendant also specifically takes issue with the State admitting into evidence Wilson's characterization of him as a liar during his recorded interview. Although it is true that an officer's opinion regarding an ultimate question of fact is prejudicial because the officer is an authority figure, the admissibility analysis still involves weighing the prejudicial effect. See *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35. Under the circumstances of this case, any statements casting defendant as a liar would not be significantly prejudicial in light of the overwhelming evidence that defendant had been untruthful at various points. Moreover, the jurors were instructed that they were responsible for determining the credibility of witnesses and they are presumed to have followed that instruction. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 49 ("Jurors are presumed to follow the instructions provided by the trial court."). Further, we note that "[s]tatements made by police officers when questioning a defendant, including opinions and observations regarding the defendant's guilt or credibility, are generally relevant and admissible to demonstrate the statements' effects on the defendant, to provide context to the defendant's responses, or to explain the logic and course of the officers' interview or investigation." *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56. As such, this evidence was also properly admitted and counsel's performance in failing to object to it was not deficient.

¶ 32    Similarly, defendant argues that O'Marah's testimony that the report was indicated as to C.R. and that "indicated" meant there was enough proof the event happened, was highly prejudicial because O'Marah was also an authority figure. Notably, counsel objected to the admission of the testimony but was overruled. Thus, the only potentially deficient performance was the failure to preserve the issue by including it in a posttrial motion. Here, the crux of

defendant's argument is that the admission of all of his complained of evidence denied him a fair trial, not that the admittance of any specific piece of evidence alone denied him a fair trial. As we have already determined the rest of his complained of evidence was properly admitted and defendant does not argue that any purported error in admitting O'Marah's testimony alone denied him a fair trial, we cannot find that he was denied a fair trial or that counsel was ineffective for failing to preserve the purported error.

¶ 33 If defendant was attempting to argue that counsel's alleged ineffectiveness in failing to preserve this issue alone required reversal, such argument fails. Specifically, "not every erroneous admission of evidence requires a reversal." *People v. Forcum*, 344 Ill. App. 3d 427, 444 (2003). "[A] new trial is warranted only where the evidence improperly admitted was so inflammatory that it deprived the defendant of a fair trial or where the improper evidence appears to have affected the outcome of the trial." *Id.* Here, the evidence against defendant was strong enough that we cannot say O'Marah's testimony affected the outcome of the trial. Specifically, the evidence indicated that C.R. was injured while he was with Rodier and defendant. O'Marah's testimony that "there was enough proof to say that the event did happen" did not comment on who caused C.R.'s injuries. The most direct evidence that indicated who injured C.R. was Rodier's testimony regarding the noises she heard while defendant was alone with C.R., which were consistent with C.R.'s injuries. Additionally, Rodier observed blood on C.R.'s face and defendant's shirt when she went to investigate the noises. These facts, coupled with the consciousness of guilt evidence, strongly point to defendant's guilt. Further, the court instructed the jury that it was to apply the law to the facts and decide the case, which would have indicated to the jury that they were not simply to accept any conclusion set forth in O'Marah's testimony. Based on the foregoing, we conclude that if the purported error had been preserved, it would not

14

have resulted in a reversal because the statements did not affect the outcome of the proceeding or undermine our confidence in the jury's verdict. Thus, defendant is unable to establish prejudice from the failure to preserve any error related to O'Marah's statements.

¶ 34                                    B. *Krankel* Inquiry

¶ 35        Defendant argues that the court did not conduct a sufficient inquiry into his ineffective assistance allegations. Specifically, he argues that the court did not discuss the issues with defense counsel and that it was necessary to do so in this matter. Further, that the court committed reversible error by resolving the claim on the merits.

¶ 36        A preliminary *Krankel* inquiry examines the factual basis of defendant's claim of ineffective assistance of counsel to determine whether to appoint new counsel to pursue the claims. *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id.* Some interchange between the court and defense counsel may be warranted. *Id.* However, "[a] brief discussion between the trial court and the defendant may be sufficient." "Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 37        Here, the court conducted a *Krankel* inquiry and discussed defendant's allegations with defendant. The court asked defendant to explain his claim of ineffective assistance regarding the six-person jury and defendant explained that counsel advised him to choose a six-person jury due

15

to the nature of the charges. Defendant continued that he trusted counsel, agreed to the 6-person jury, and signed the document requesting a 6-person jury/waiving a right to a 12-person jury. From this exchange, the court was able to determine that defendant's issue was with counsel's advice to choose a 6-person jury, that the advice constituted a matter of trial strategy, and thus, it did not need to appoint new counsel to represent defendant. See *id.* at 78. In other words, the discussion between the court and defendant was sufficient for the court to resolve the claim. See *id.* Further, the record establishes that the court repeatedly inquired, and defendant repeatedly confirmed that he wanted a 6-person jury rather than a 12-person jury. Therefore, we conclude that under the circumstances of this case, it was not necessary for the court to discuss the matter with defense counsel and the court conducted a sufficient *Krankel* inquiry.

¶ 38 As to defendant's argument that the court committed reversible error by reaching the merits of his ineffective assistance claim, our supreme court has previously rejected that argument and stated "even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel." (Emphasis in original.) *People v. Roddis*, 2020 IL 124352, ¶ 61. Therefore, this argument necessarily fails.

¶ 39                                              III. CONCLUSION

¶ 40 The judgment of the circuit court of Peoria County is affirmed.

¶ 41 Affirmed.